2002-NMCA-015

40 P.3d 449

Mary E. WALTA, Plaintiff–
Counterdefendant–
Appellee,

v.

GALLEGOS LAW FIRM, P.C., a New Mexico professional corporation, and J.E. "Gene" Gallegos, Defendants–Counterclaimants–Appellants.

No. 20,913.

Court of Appeals of New Mexico.

Dec. 14, 2001.

Certiorari Denied, No. 27,281, Jan. 28, 2002.

K. Stephen Royce, Maureen A. Sanders, Sanders & Westbrook, P.C., Philip B. Davis, Albuquerque, NM, for Appellee.

Sarah Singleton, Montgomery & Andrews, P.A., Steven L. Tucker, Tucker Law Firm, P.C., Santa Fe, NM, for Appellants.

*OPINION*

BUSTAMANTE, Judge.

{1} This case involves the contested restructuring of a professional corporation engaged in the practice of law. J.E. "Gene" Gallegos (Gallegos) appeals the jury's award of punitive damages in favor of Mary E. Walta (Walta) for breach of fiduciary duties with respect to the purchase of Walta's stock in the corporation. Gallegos argues that the award of punitive damages cannot be supported for three reasons: (1) he fulfilled his fiduciary duties as a majority stockholder of a close corporation in purchasing the stock of a minority shareholder by disclosing all material information bearing on the value of the stock, (2) the "economic loss rule" bars recovery in tort when damages flow from a breach of contract, and (3) punitive damages cannot be awarded absent proof of a culpable state of mind coexistent with the conduct that constitutes the breach of legal duty. We affirm and address the nature of the fiduciary duties shareholders and directors of close corporations owe to each other.

{2} Our discussion of the scope of fiduciary duty will inform our examination of the standard of conduct necessary to support the award of punitive damages in this context.

■ {3} We decline to address the economic loss rule argument. This argument was not made in any manner or form to the trial court. Gallegos acknowledges this issue was not preserved below, but urges us to apply a fundamental error analysis to reach the issue. We do not believe the issue is appropriate for application of fundamental error. *Gracia v. Bittner*, 120 N.M. 191, 196, 900 P.2d 351, 356 (Ct.App.1995). In fact, given our holding in this case, there was likely no error at all.

**BACKGROUND**

{4} The Gallegos Law Firm, P.C. (GLF), is a New Mexico professional corporation engaged in the practice of law. Gallegos founded GLF in 1987 and has always served as the corporation's president. Walta joined GLF in January 1990. As of November 1994, GLF had five attorney-shareholders: Gallegos, Walta, Michael Condon, David Sandoval, and Glenn Theriot. At that time, Gallegos owned 4,000 shares (50%) of GLF's stock. Walta owned 2,000 shares (25%) of GLF's stock. The balance of the corporation's 8,000 issued and outstanding shares were held by Condon (1,000 shares), Sandoval (900 shares), and Theriot (100 shares).

{5} While GLF enjoyed reasonable financial success, it experienced sporadic financial pressures during 1993 and 1994. This resulted in some dissension among its shareholders. As early as June 1992, Walta had spoken in opposition to GLF's acceptance of certain contingency fee cases. On a number of occasions, Walta told Gallegos that the manner in which GLF accepted contingency fee cases should be reformed. Walta thought GLF was becoming too indebted on its line of credit because of its contingency case load. Gallegos responded with annoyance at Walta's concerns because he believed his experience made him more qualified than Walta to evaluate such cases.

{6} Walta felt Gallegos often singled her out as the source of his irritation. By 1993 GLF had become heavily involved in several contingent fee matters taken on by Gallegos that were taxing GLF's resources. Despite this, Gallegos had GLF spending heavily, including a corporate aircraft with added pilot and hangar expense. Expenses remained high and the bank lines of credit were heavily utilized. During an April 1993 shareholder meeting, Gallegos abruptly cut off Walta's efforts to discuss GLF's finances, saying:

> [H]e didn't need [her] to tell him how to do—how to manage a firm. That he had been practicing law for 35 years. He didn't need [her] input. He didn't need [her] to tell him how to take cases.... And then he said to [her] "I am sick and tired of you nagging at me. You remind me of one of my ex-wives, and the same

thing is going to happen to you that happened to her if you don't be quiet."

Later in 1993, Gallegos wanted Walta and Condon to sign a personal guarantee for GLF's burgeoning line of credit. When they disagreed with his demand, Gallegos discontinued their stock purchase rights.

{7} In early November 1994, Gallegos invited Walta to lunch. Walta characterized this as an unusual event. He questioned Walta about her future plans, referenced Walta's growing practice, and specifically asked her whether she planned to leave GLF soon. Walta, surprised, said she had no plans to leave. Gallegos then repeated to Walta his "five year plan" to phase out of the practice of law and his desire to implement it. Gallegos indicated to Walta that he did not expect the GLF structure to change as he phased out of active practice.

{8} A few days later on November 27, 1994, Gallegos circulated a memorandum to each of GLF's four other shareholders, including Walta, proposing that GLF purchase their stock, leaving Gallegos the sole shareholder. The memorandum was left on each shareholder's desk on the Sunday evening following Thanksgiving. As an alternative, Gallegos suggested Walta and the other three shareholders could purchase Gallegos' stock with Gallegos departing from the firm if any of the shareholders believed that the proposal was not reasonable and acceptable. The memorandum implied that Gallegos' desire to dissolve GLF was motivated by his wish to devote more time to his family and personal interests, and by a desire to change the manner in which he practiced law.

{9} Walta testified that, immediately upon reading the memorandum, she believed the memorandum "fired" her, that it was directed at getting her out of GLF, and that her departure was a "done deal" over which she had no control. Walta concluded that Gallegos' proposals violated the GLF's by-laws, and she obtained legal advice concerning her rights. Walta kept all this to herself; she did not inform Gallegos that she objected to either proposal set forth in the memorandum until her last day at GLF, four months later on March 31, 1995. Walta testified that she did not talk to Gallegos about the memorandum because of the "angry tone" of the memorandum, and because she feared that Gallegos would retaliate against her for doing so.

{10} The terms of the proposal included that "stock will be surrendered and valued in accordance with the corporate by-laws as of December 31, 1994 and your employment terminated at that time." The firm's by-laws distinguished between "vested" and "non-vested" stock when valuing a departing shareholder's stock surrendered to the corporation. Walta's 2,000 shares of GLF stock included both vested and non-vested stock. For non-vested stock, generally, the shareholder would be paid the equivalent of the purchase price of the stock or no less than "the exact cost of the stock to him or her." Walta and the other shareholders had paid $10 per share. Vested stock was not so easily valued.

{11} Stock became "vested" only if a shareholder had at least three years of employment commencing from "the date that he or she first acquired shares in the corporation." A shareholder surrendering vested stock would receive "present book value ... as of the effective date of termination." The by-laws defined "present book value" as follows:

> [T]he calculation of per share value resulting from total[ ]ing the assets of the corporation, subtracting the liabilities of the corporation, and dividing the net sum, if any, by the number of shares issued and outstanding. For this valuation, the corporate assets shall not include unbilled work in progress, but shall include collectible accounts receivable, including those billed for the month in which the shareholder's termination or disqualification is effective. Present book value shall be calculated as of the effective date of the shareholder's termination or disqualification.

If the computation of "present book value" yielded a negative value, or a value of less than $10 per share, the value of the vested stock would nevertheless be deemed to be the shareholder's acquisition price; $10 per share.

{12} GLF's shareholders met on December 15, 1994. All five shareholders, including

Walta attended. Gallegos solicited responses to the November 27, 1994, memorandum. Walta commented on several aspects of the proposal, such as the need to extend the transition period, the effect of the proposal on the firm's clients, and the need to have time for the clients to decide whether their matters would stay with GLF or go with departing shareholders. It is uncontradicted that, during this meeting, Walta did not raise any concerns about valuation and buy-out of her stock or about the termination of her employment by the firm. At the conclusion of the meeting, Gallegos stated that he was open to extending the shareholders' transition until March 31, 1995; this was eventually done.

{13} On January 4, 1995, GLF's shareholders sent Gallegos a memorandum authored by Walta raising "[a] number of questions ... as to the proposed buy-out," and suggesting a shareholders' meeting to discuss the buy-out. The first of the multiple questions in the memorandum was "[t]iming. Unofficially set for 3/31/95. Is this now a firm date?"

{14} Gallegos responded on January 6, writing "The end of the transition period is firmly March 31, 1995." His memorandum further stated:

The operative date for stock evaluation is December 31, 1994. While the by-laws provide for options to purchase additional shares in January 1995, it is apparent that would be inappropriate given what I take to be all shareholders' agreement to sell out to the firm. On the same basis that December 31, 1994 is the operative date for buy-out of shares, departing shareholders have no concern regarding 1995 profit or loss. Payment for a departing shareholder's stock will be made on April 1, 1995 in full.

{15} From December 15, 1994, until Walta's departure from GLF on March 31, 1995, Walta and Gallegos met on a number of occasions to discuss year-end firm finances with the firm's accountant, to discuss the transition of client files, to work on pending cases and other matters. Gallegos testified Walta did not ask him about the buy-out of her stock or the financial information for

valuing the stock, and she did not venture an estimate of her own as to the value of the stock.

{16} There was evidence that during this time GLF's working atmosphere was very strained. Gallegos communicated with Walta only on a "need to" basis, frequently in writing. Gallegos refused Walta access to GLF's monthly financial statements. Walta had to point out that Condon had access to them to get Gallegos to relent. Gallegos excluded Walta from GLF's presentations to prospective clients, although Condon and Sandoval continued to be included. Though GLF clearly promised to be busy in the months ahead, Gallegos offered Walta no contract work to assist her in her transition. When Walta attempted to purchase office furniture and books from GLF before she left, Gallegos refused, contrary to the offer in his November 27, 1994, memorandum. Walta was permitted to take only the furniture in her office, as was her right under the Shareholder's Agreement, and a few small items for which she paid book value. Walta testified she received no help from Gallegos in finding another job.

{17} Due to her tenure, Walta felt that 1000 shares of her stock was vested. Only Walta and Gallegos owned vested stock. Gallegos had represented in his November 27, 1994, letter that he would proceed under the by-laws in valuing the stock of departing shareholders under his proposed stock buy-out. However, on March 28, 1995, Walta received a copy of a letter from Gallegos to another shareholder, Theriot. As a new shareholder, Theriot was not vested and was not entitled to receive more than par value; ten dollars ($10) per share. Gallegos' letter to Theriot stated that under the "present book value" formula in the by-laws Gallegos had circulated, the stock had a "negative value" on December 31, 1994, and therefore, vested stock would only be valued at par, or $10 per share. Gallegos admitted to the jury that the letter was intended to deliver a message to Walta that she would only be paid $10 per share as well. Gallegos did not disclose that, in arriving at a "negative value" for GLF's stock, he had omitted certain accounts receivable from the calculation be-

cause he thought at that time they were not "collectible accounts receivables" within the definition of present book value in the by-laws.

{18} To value Walta's vested stock, Gallegos testified he used a substitute for GLF's "collectible accounts receivable," and used December 31, 1994, as Walta's termination date. Gallegos testified he did not use actual "collectible accounts receivable" as stated in the by-laws' definition of "present book value" because GLF business practices did not and had never included preparation of a report that provided such information. GLF accounting was on a cash basis, rather than an accrual basis; accordingly no amount for accounts receivable was entered on the regularly produced balance sheets. Gallegos felt that whether or not an account receivable was, in the words of the by-laws "collectible," had to be a judgment call for management to make by manually examining each account and forming an estimate of future collectibility. Gallegos opined that it would have required considerable time and subjective judgment to collect information on accounts receivables and determine whether they were collectible.

{19} Gallegos testified he valued Walta's stock using the same method used by the directors, including Walta, to value vested stock the only other time a shareholder with vested stock had left GLF. That shareholder, Michael Oja, resigned in February 1993. When valuing Oja's vested stock in April 1993, the directors used the dollar amount of accounts billed to clients for February 1993, the month of the shareholder's departure, as a substitute for "collectible accounts receivable." Although that procedure did not comply with the letter of the by-laws, all the directors, including Walta, had agreed to it. That method could result in an amount either more or less than the actual collectible accounts receivable; *e.g.*, billings from the first of the month could be paid and no longer "receivable" but would be included.

{20} Gallegos' method of calculation resulted in a stock value for both vested and nonvested stock of $20,000—the amount Walta had paid for the stock.

{21} At trial, experts for Gallegos, GLF, and Walta had the advantage of hindsight in totaling accounts actually collected after Walta left. Gallegos' expert concluded that as of December 31, 1994, the GLF had accounts receivable of $657,989, and that even under his conservative estimate, the value of Walta's vested shares as of December 31, 1994, was $41,275, not $20,000, as contended by Gallegos. The jury ultimately decided that all of Gallegos's stock was worth $62,550, the amount calculated by Gallegos's expert.

{22} On March 31 Walta left a letter on Gallegos' desk informing him that "I believe my termination of employment with the firm is wrongful and without cause." Walta's letter also stated that she had retained an attorney "as my legal counsel" to whom she had delivered her GLF stock to "work out the surrender of the stock." She wrote: "You have indicated that the value which you will assign to my stock is $10 per share, the cost of the stock. I dispute your valuation, as well as your determination that December 31, 1994 is to be the date upon which the valuation is based."

{23} Walta testified that between the time of Gallegos' stock buyout memorandum and her departure from GLF, it became apparent to her that Gallegos' actual intention in the stock buyout was to convert GLF to a corporation with a sole shareholder—Gene Gallegos, and to restructure the firm to remove only one attorney—Walta. Contrary to Gallegos' prior representations that going forward GLF would be comprised of only himself and a young associate, Walta discovered that before the end of 1994, Gallegos had offered shareholder Michael Condon continued full-time employment as a salaried associate with GLF after March 31, 1995. Condon accepted and was given a salary increase. Gallegos misrepresented to Walta that Condon was only working on contract. Walta also learned that shareholder David Sandoval had been offered continued full-time salaried employment, even though prior to the November 27, 1994, memorandum, Sandoval had already announced his resignation from GLF. Sandoval declined the offer. Walta also learned that Gallegos had offered shareholder Theriot contract employment in-

definitely, without shareholder status. It was only Walta who was not asked to continue at GLF.

{24} In sum, based primarily on her testimony, if believed by a jury, Walta's evidence and theory of the case was to the effect that Gallegos disliked her, was angry at her, was dictatorial in his management of GLF, and that the firm's buy-out of the four attorney-shareholders was accomplished solely to get rid of her.

{25} In a June 6, 1995, letter, Walta's attorney valued her stock at $52,000, based on the valuation set for shareholder Oja in 1993, and the view that Walta's stock was 100% vested. Gallegos testified he disagreed with the amount claimed in the letter because her stock could not have been 100% vested. Gallegos understood the letter as demanding in excess of a half million dollars to settle all of Walta's claims, and not offering to settle any single claim. Walta herself was unsure if she would have accepted payment for her stock unless all of her claims were settled in a package deal. At no point did Walta surrender her stock to GLF, the requisite to being paid for it. Although the by-laws included a provision for arbitration of disputes concerning stock value, no one demanded arbitration. Gallegos' response to these settlement demands, was that he wanted the stock valuation and other issues to be resolved by a court.

## PROCEDURAL POSTURE

{26} In July 1996 Walta sued GLF and Gallegos for money damages, alleging six separate claims for relief, including breach of employment contract, breach of obligations owed to shareholders under the shareholder agreement, breach of fiduciary duties, retaliatory discharge, promissory estoppel, and intentional interference with contractual relationship. GLF and Gallegos answered the complaint and counterclaimed. GLF and Gallegos later filed an amended counterclaim against Walta asserting malicious abuse of process.

{27} The trial court directed a verdict against Walta on her retaliatory discharge and promissory estoppel claims and against Gallegos on his malicious abuse of process claim. Thereafter, Gallegos withdrew all of his remaining counterclaims and the matter was submitted to the jury only on Walta's surviving claims.

{28} The jury found in favor of GLF and Gallegos on Walta's breach of employment agreement and interference with contract claims. The jury found in favor of Walta, and against GLF, only on her claim for breach of the shareholder agreement, and in favor of Walta and against Gallegos alone for "breach [of] his fiduciary duties with respect to the Plaintiff's shareholder agreement and to Plaintiff Mary Walta." The jury awarded Walta compensatory damages in the amount of $62,550 against both GLF and Gallegos for the value of her stock. Though Walta requested punitive damages against both Defendants, the jury awarded them only against Gallegos individually, in the amount of $100,000.

{29} Gallegos does not appeal the award of compensatory damages. He makes a two-pronged argument for reversal of the punitive damages award against him. First, he asserts that the fiduciary duty claims should not have been submitted to the jury at all because—if the duty is defined correctly—there was no question he fulfilled his obligations. As a backstop, he also argues that the fiduciary duty instruction given was incomplete and did not provide sufficient guidance to the jury. Second he argues that in the wake of the jury's verdict against Walta on her breach of employment contract and interference with contract claims, there is no evidence of the kind of culpable state of mind necessary to support punitive damages.

## SCOPE OF FIDUCIARY DUTY

{30} The parties agree that some sort of fiduciary duty exists between them. They disagree as to its scope.[1]

---

1. Gallegos posits a four-factor test which is simply too narrow and is incompatible with the high standard of good faith we believe should apply. Gallegos' proposed test is: (a) an officer or director of a close corporation is dealing with a minority shareholder, (b) the purchaser withholds information that if made known would bear materially on the value of the stock, (c) the minority owner sold their stock, and (d) the price received was less than actual value. The test

{31} Gallegos correctly asserts that the nature of the fiduciary duty owed between shareholders and directors of close corporations is a matter of first impression in New Mexico. We have a few cases involving small corporations in conflict, but they do not address this issue. For example, *Schwartzman v. Schwartzman Packing Co.,* 99 N.M. 436, 439, 659 P.2d 888, 891 (1983), involved the common law and statutory duty to allow examination of corporate books, but the court there had no reason to explore the contours of other shareholder's duties. In *McCauley v. Tom McCauley & Son, Inc.,* 104 N.M. 523, 529, 724 P.2d 232, 238 (Ct.App.1986), this Court examined the concept of "oppressive conduct" sufficient to support judicial intervention in corporate affairs under the New Mexico corporation statute in effect at that time. *See also* NMSA 1978, § 53–16–16(A)(1)(b) (1967). *McCauley* is useful to us for its general approach and observations about the characteristic features of close corporation, but it does not address the idea of an enforceable fiduciary duty between shareholders outside the context of the corporation statute's provision for relief from illegal, oppressive or fraudulent conduct. *Id.,* 104 N.M. at 526–29, 724 P.2d at 235–38.

{32} We start by examining the close corporation. In a widely cited opinion, the Massachusetts Supreme Judicial Court defined a close corporation as one "typified by: (1) a small number of stockholders; (2) no ready market for the corporate stock; and (3) substantial majority stockholder participation in the management, direction and operations of the corporation." *Donahue v. Rodd Electrotype Co.,* 367 Mass. 578, 328 N.E.2d 505, 511 (1975). *See generally* O'Neal & Thompson, *O'Neal's Close Corporations* § 1.02 (3rd ed.) (hereafter O'Neal's).

{33} These characteristics of close corporations may sometimes be abused to allow majority shareholders to take advantage of minority shareholders. Minority shareholders are vulnerable to a variety of oppressive devices. These devices include refusing to declare dividends, draining of corporate earnings in the form of exorbitant salaries and bonuses paid to majority shareholders, denying minority shareholders corporate offices and employment, and selling corporate assets to majority shareholders at reduced prices. *Donahue,* 328 N.E.2d at 512–13. This Court noted the same phenomenon as the potential for the "freeze out' or squeeze out' of minority shareholders by use of oppressive tactics." *McCauley,* 104 N.M. at 527, 724 P.2d at 236; *see* O'Neal's §§ 9.02, 9.03.

{34} To combat such tactics, courts have, over the years, recognized various versions of fiduciary duties that majority or controlling shareholders owe to minority shareholders. *See generally* 3 William Meade Fletcher, *Cyclopedia of the Law of Private Corporations* § 838 (rev. perm. ed. 1994 & Cum.Supp. 2000) (asserting that all jurisdictions now recognize a fiduciary duty between officers and shareholders); O'Neal's § 9.19 (same). The general rule has been sufficiently developed by appellate opinions to establish that the fiduciary duty does not depend on shareholder control, but rather arises out of the nature of a closely held corporation. For example, some courts have explicitly recognized that the duty extends to minority shareholders in close corporations. *Zimmerman v. Bogoff,* 402 Mass. 650, 524 N.E.2d 849, 853 (1988); *A.W. Chesterton Co. v. Chesterton,* 128 F.3d 1, 6 (1st Cir.1997). As the *Donahue* court noted "the minority may do equal damage through unscrupulous and improper sharp dealings' with an unsuspecting majority." *Donahue,* 328 N.E.2d at 515 n. 17 (citing *Helms v. Duckworth,* 249 F.2d 482 (1957)).

{35} Starting with its observation that "the close corporation bears striking resemblance to a partnership," *Id.* at 512, the *Donahue* court's formulation stands today as the purest expression of the fiduciary duties owed by shareholders:

> Because of the fundamental resemblance of the close corporation to the partnership, the trust and confidence which are essential to this scale and manner of enterprise, and the inherent danger to minority inter-

imposes an improper requirement when it presupposes an actual sale before a breach can occur. Further, the test does not adequately address the effect of breaches of the shareholders' agreements with regard to stock purchases.

ests in the close corporation, we hold that stockholders in the close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another. In our previous decisions, we have defined the standard of duty owed by partners to one another as the "utmost good faith and loyalty." Stockholders in close corporations must discharge their management and stockholder responsibilities in conformity with this strict good faith standard. They may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation.

*Id.* at 515. (Footnotes and citations omitted).

{36} Since the *Donahue* decision, the Massachusetts court has refined its notion of fiduciary duty. Recognizing that self-interest is not necessarily synonymous with improper motivation, the court held that controlling groups should be allowed to demonstrate a legitimate business purpose for their actions. *See Wilkes v. Springside Nursing Home, Inc.*, 370 Mass. 842, 353 N.E.2d 657, 663 (1976). Upon demonstration of such a purpose, the court then determines "the practicability of a less harmful alternative" to the minority interest. *Id.* This common sense approach alleviated the court's concern that "untempered application of the strict good faith standard" could unduly hamper corporate management. *Id.* at 663. This approach provides equilibrium to the majority's need to pursue legitimate business actions and the minority's vulnerability to oppression in a close corporation.

{37} Though formulated somewhat differently, other courts have followed the *Donahue/Wilkes* lead. For example, the Mississippi Supreme Court characterized *Donahue* and other cases as decisions which "evince the evolving awareness by courts of the distinctive characteristics and needs of close corporations." *Fought v. Morris*, 543 So.2d 167, 171 (Miss.1989). The court in *Fought* stated that majority action must be "intrinsically fair" to minority interests and observed that the relationship between shareholders in close corporations was of trust and confidence—the same relationship which prevails in partnerships. *Id.* The Minnesota courts have similarly analogized close corporations to partnerships as a basis for the recognition of fiduciary duties owed between shareholders. *See Berreman v. West Publ'g Co.*, 615 N.W.2d 362, 367 (Minn.Ct.App.2000) and cases cited therein.

{38} We agree with the reasoning and approach of these cases. While the analogy to partnership principles is incomplete because partners are provided more protection by statute from freeze-out tactics than corporate shareholders, it is still useful. *See* NMSA 1978, § 54–1A–401(f), (h), (i), (j) (1997). The analogy recognizes the nature of close corporation organization and, because our partnership case law is reasonably well-developed, it provides a ready source of precedent helping to provide content to the concept of fiduciary duty.[2] *See McCauley,* 104 N.M. at 529, 724 P.2d at 238. Thus, we hold that Gallegos owed Walta a fiduciary duty in his efforts to restructure GLF, including the purchase of her GLF stock. And, drawing on our partnership case law, we hold that breach of this fiduciary duty can be asserted as an individual claim separate from the remedies available under our statutory corporate law for oppressive conduct. *See Fate v. Owens,* 2001–NMCA–040, ¶¶ 23–25, 130 N.M. 503, 27 P.3d 990; Restatement (Second) of Torts § 874 (1977).

{39} Of course, recognizing the fiduciary nature of a relationship does not give it content in any given context. As we noted in *McCauley* with regard to the concept of oppressive conduct, no specific catalog of elements is necessary or perhaps even appropriate. Too narrow a definition of an expansive term would be ossifying. *McCauley,* 104 N.M. at 537, 724 P.2d at 246. We can, however, place this duty in the context of other standards of right conduct recognized

**2.** We recognize that the legislature has now imposed a statutory fiduciary standard on partnerships. NMSA 1978 § 54–1A–405 (1997). We do not believe the statutory standard affects the common law principles which we cite. However, the statute has not been interpreted by the courts and is not before us directly. Thus, it would be inappropriate for us to opine on its meaning or its effect, if any, in this context.

by the law, and we can provide guidance for analogous cases where restructuring a close corporation includes termination of shareholder/employer and corporate purchase of shares.

{40} First, it seems self-evident that a fiduciary duty is inconsistent with standards of conduct typically at play in arm's-length commercial or business transactions. As Chief Judge Cardozo noted: "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties.... Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545, 546 (1928). The standard for a fiduciary, in this context, is thus higher than the duty of good faith and fair dealing imposed on all contractual relationships. *Watson Truck & Supply Co. v. Males*, 111 N.M. 57, 60, 801 P.2d 639, 642 (1990).

{41} The duty between shareholders of a close corporation is similar to that owed by directors, officers, and shareholders to the corporation itself; that is, loyalty, good faith, inherent fairness, and the obligation not to profit at the expense of the corporation. *DiLaconi v. New Cal Corp.*, 97 N.M. 782, 788, 643 P.2d 1234, 1240 (Ct.App.1982); *Donahue*, 328 N.E.2d at 515–16.

{42} In adopting the Massachusetts approach, we are clearly aligning ourselves with the line of cases which impose a high duty of candor and good faith when majority shareholders are dealing with minority shareholders. *See, e.g., Orchard v. Covelli*, 590 F.Supp. 1548, 1556–57 (W.D.Penn.1984) (recognizing an enhanced fiduciary duty for directors and officers when dealing with minority shareholders in a close corporation); *cf. Van Schaack Holdings, Ltd. v. Van Schaack*, 867 P.2d 892, 897 (Colo.1994) (en banc) (adopting the "special facts" doctrine to impose an enhanced fiduciary duty to fully disclose material information bearing on the value of stock when purchased by the close corporation). While some commentators would label the approach we adopt as the "minority view," our review of the case law informs us that it is actually the prevalent view among those courts which have addressed the issue. *See* P.A. Agabin, Annotation, *Duty and Liability of Closely Held Corporation, its Directors, Officers or Majority Stockholders, in Acquiring Stock of Minority Shareholder*, 7 A.L.R.3d 500 (1966 & 2000 Supp.); 3A *Fletcher Cyclopedia of the Law of Corp., supra*, §§ 1167–71; O'Neal's § 9.21.

{43} Having generally defined the rigor of the fiduciary duty, one must apply it to specific aspects of the legal relationship between shareholders in a close corporation. Issues are most likely to arise in connection with valuation of the stock, the related matter of disclosure of material facts relating to corporate officers, and adherence to contractual obligations between the shareholders.

{44} The duty of full disclosure of material facts affecting the value of stock has been dealt with often by the courts. The majority of the cases impose a duty of full, voluntary disclosure. *Van Schaack*, 867 P.2d at 898; *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 435 (7th Cir.1987) ("Close corporations buying their own stock, like knowledgeable insiders of closely held firms buying from outsiders, have a fiduciary duty to disclose material facts."); *Thorne v. Bauder*, 981 P.2d 662, 664 (Colo.Ct.App.1998); *Shermer v. Baker*, 2 Wash.App. 845, 472 P.2d 589, 594 (1970); *Berreman*, 615 N.W.2d at 371. The requirement of full disclosure felicitously acts to equalize bargaining positions where valuation is typically difficult. The cases are clear that the duty requires disclosure beyond mere access to the books and records of the corporation. *Van Schaack*, 867 P.2d at 898–99; *Michaels v. Michaels*, 767 F.2d 1185, 1200 (7th Cir.1985). Our cases have consistently held that partners, as fiduciaries, are "required to fully disclose material facts and information relating to partnership affairs to the other partners, even if the other partners have not asked for the information." *Fate*, 2001–NMCA–040, ¶ 25, 130 N.M. 503, 27 P.3d 990.

{45} In accordance with these authorities, we hold as a matter of New Mexico law that a majority shareholder, as well as an officer or director of a close corporation,

when purchasing the stock of a minority shareholder, has a fiduciary obligation to disclose material facts affecting the value of the stock which are known to the purchasing shareholder, officer, or director by virtue of his position, but not known to the selling shareholder. We adopt the standard for what information is material established by the United States Supreme Court in *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757, (1976) (An omission or misstatement is material if there is a "substantial likelihood that, under all the circumstances, the omitted [or misstated] fact would have assumed actual significance in the deliberations of the reasonable shareholder.")

{46} This case—as perhaps most cases of this kind will—includes a shareholder agreement. It is undisputed that Gallegos and GLF did not follow the letter of the shareholder agreement embodied in the GLF by-laws, either as to Walta's termination as an employee or the valuation of her shares in connection with the proposed buy-out.[3] What is the nature of the fiduciary duty arising from shareholder agreements and when may non-compliance with such agreements be deemed a breach of the duty? This case is similar to *Fought v. Morris.* There, one of the shareholders wanted to sell his shares. Morris bought all of the departing shareholders' stock—contrary to the stock redemption agreement controlling such events between them. Thereafter, Morris "froze out" Fought and offered to buy his shares at an improperly reduced price which was calculated contrary to the formula set forth in their agreement. *Fought*, 543 So.2d at 171–72. The Mississippi court held that breach of the shareholder agreement could also be a breach of the majority's fiduciary duty. The Court went on to hold that both the improper purchase and the improper value calculation were actionable breaches of Morris' fiduciary duty.

{47} We adopt the *Fought* court's reasoning, noting, however, that not every noncompliance with a shareholder agreement is necessarily a breach of fiduciary duty—but in appropriate circumstances may be. As with most matters of judgment, whether a breach of fiduciary duty has occurred will normally be a question of fact for the jury.

{48} We pause to note that the fiduciary duty we define here is a default standard applicable in the absence of a contrary agreement between shareholders. Shareholders are free to agree to different standards as long as the essence of right conduct is preserved.

## ADEQUACY OF JURY INSTRUCTIONS

{49} Gallegos also argues that under any standard the jury was not properly instructed as to the scope of Gallegos' fiduciary duty. We disagree. The jury was given the following instructions:

### INSTRUCTION NO. 33

Each shareholder in a closely-held corporation such as the Gallegos Law Firm occupies a fiduciary relationship with each other.

### INSTRUCTION NO. 34

A fiduciary relationship exists whenever a special confidence is reposed in one person who in equity and good conscience is bound to act in good faith and with due regard to the interests of the person reposing the confidence.

Gallegos' requested instruction read as follows:

### DEFENDANTS' AND COUNTERCLAIMANTS' REQUESTED JURY INSTRUCTION NO. 34

Each shareholder in a closely-held corporation such as [the] Gallegos Law Firm occupies a fiduciary relationship with each

---

**3.** The jury found against Walta on her breach of employment contract claim. Thus, the jury decided that non-compliance with the by-laws as to her employment status was not actionable. The basis for that decision need not detain us since Walta has not appealed the verdict against her. However, resolution of the employment status says nothing about the jury's resolution of the issues surrounding Walta's status as a shareholder.

other shareholder. These fiduciary duties of each shareholder include:

1. the duty of loyalty to each other;
2. the duty to fully disclose material facts regarding transactions and dealings with each other;
3. the duty to deal openly, honestly and fairly with other shareholders;
4. the duty to avoid self-seeking conduct and self-dealing; and
5. the duty of good faith and fair dealing with respect to other shareholders.

Failure to comply with any of these duties is a breach of fiduciary duty.

*Donahue v. Rodd Electrotype Co.,* 367 Mass. 578, 328 N.E.2d 505 (1975); *Evans v. Biesi,* 345 N.W.2d 775 (Minn.Ct.App. 1984); *American Federal Group, Ltd. v. Rothenberg,* 136 F.3d 897 (2nd Cir.1998).

Four observations emerge from our examination of Gallegos' requested instruction. First, it does not match the standard he now argues for in this appeal. Second, it does not address in any adequate way one of the aspects of fiduciary duty most relevant here; that is, adherence to the shareholder agreement and fair pricing. Third, to the extent paragraph five of the instruction refers to the standard duty of good faith, it is incorrect and could have been misleading and harmful to jury consideration of the case.

▆▆▆ {50} Fourth, the instruction is drawn from the *Donahue* formulation we rely upon in part for our decision. Thus, we do not disagree with the numbered duties that the instruction includes, with the exception of number five. These illustrative duties may well in the future become parenthetical alternatives in a general fiduciary duty uniform jury instruction. The question for us, however, is whether the failure to give them here requires reversal. We do not believe so. The instructions given adequately covered the subject. Instructions 33 and 34 conveyed the essence of the honest right conduct required of close corporation shareholders. Specific application of the general principle of right conduct could be, and was, dealt with in argument by counsel.

▆▆ {51} Finally, we fail to see how giving the requested instruction could have been of any help to Gallegos in swaying the jury to his position. If anything, the four *Donahue* factors would in our view make it easier for the jury to find against Gallegos. Thus, we see no prejudice to Gallegos even if we assume that refusing his instruction was somehow erroneous.

▆▆ {52} In this case there was evidence to support a jury conclusion that Gallegos breached his fiduciary obligations owed to Walta. As majority shareholder of a close corporation, as well as an officer and director, Gallegos had a duty of openness to disclose material facts affecting the value of the stock in regard to the proposed buy-out. The shareholder agreement defined that duty in more detail. At the very least, that duty included compliance with the valuation formula set forth in the shareholder agreement, or a full and frank disclosure of any deviation from that formula and the reasons why.

{53} The record supports a conclusion that Gallegos did neither. He purposely omitted a valuation for the collectible accounts receivables and did not disclose that fact to Walta. Then, when confronted by Walta, Gallegos continued to refuse to perform his obligations under the shareholder agreement. The jury found the corporation liable for breach of the shareholder agreement. That breach was a direct result of Gallegos' failure to respect Walta's rights as a minority shareholder, in the particular context of a buy-out, and, as the jury also found, to fulfill his obligations to her as a fiduciary. We conclude that both the law, as previously discussed, and the facts, as elicited at trial, support a jury verdict that Gallegos breached his fiduciary obligations in his dealing with Walta.

## STANDARD OF CONDUCT FOR PUNITIVE DAMAGES

{54} Gallegos' evidentiary challenge to the award of punitive damages has two aspects. First, he argues that evidence of conduct unrelated to the stock valuation cannot be used to support punitive damages. Second, he asserts that the evidence left, after clearing the chaff, is not sufficient to support a finding of the sort of culpable mental state required by our case law to impose punitive

damages. Walta disagrees with Gallegos' effort to parse the evidence so closely. Walta further argues that separate proof of a culpable mental state is not required to impose punitive damages, and that proof of the conduct required to support the basic tort of breach of fiduciary duty is sufficient to support punitive damages.

{55} We hold that New Mexico's general approach to punitive damages applies to breach of fiduciary duty cases such as this. Thus, a finding of a culpable mental state is necessary in order to impose punitive damages. However, we disagree with Gallegos' approach to consideration of the evidence.

{56} Our Supreme Court's decision in *Paiz v. State Farm Fire & Cas. Co.*, 118 N.M. 203, 211, 880 P.2d 300, 308 (1994) signaled a new approach to the imposition of punitive damages in New Mexico. Reaffirming the limited purpose of punitive damages—to punish and deter—*Paiz* required a showing of "evil motive" or a "culpable mental state." *Id.* That standard has been applied and refined thereafter in different contexts, but the requirement remains the same. There must be evidence of culpable conduct beyond that necessary to establish the underlying cause of action. *See Jones v. Lee*, 1999–NMCA–008, ¶¶ 26–27, 126 N.M. 467, 971 P.2d 858 (involving breach of contract to purchase residence); *Allsup's Convenience Stores v. N. River Ins. Co.*, 1999–NMSC–006, ¶¶ 26–27, 127 N.M. 1, 976 P.2d 1 (involving claim against insurance company for failure to properly administer a worker compensation policy); *Teague–Strebeck Motors, Inc. v. Chrysler Ins. Co.*, 1999–NMCA–109, ¶¶ 76–90, 127 N.M. 603, 985 P.2d 1183 (noting distinction between "bad faith" sufficient to support compensatory damages and "bad faith" meriting punitive damages in first party insurance bad faith cases).

{57} We see no reason why this principle should not apply in the context of this case. The underlying purpose of punitive damages as punishment and deterrence remains the same. We can conceive of breaches of fiduciary duty sufficient to support compensatory, but not punitive, damages. Even in this area, culpability can and should be "measured on a continuum of reasonableness imposed in light of" a shareholder's fiduciary obligation. *Id.* ¶ 88. The continuum is influenced by the standard of conduct imposed on the actor. The more stringent the standard of conduct, the more likely that breach of the standard will demonstrate a culpable mental state. *Id.*

{58} Our holding is consistent with cases outside of New Mexico which consider the issue. *See In re Estate of Wernick*, 127 Ill.2d 61, 129 Ill.Dec. 111, 535 N.E.2d 876, 886–87 (1989) (noting that punitive damages are available in breach of fiduciary cases but that appropriate imposition of punitives is dependent on the specific facts of each case and whether those facts can be characterized as wanton, malicious or aggravated); *Bresnahan v. Bresnahan*, 115 Md.App. 226, 693 A.2d 1, 7–9 (1997) (noting distinction between proof sufficient to support compensatory award and proof of actual malice to support punitive damages and holding that this general rule applied to case of breach of fiduciary duty).

## EVIDENCE IN SUPPORT OF A CULPABLE MENTAL STATE

{59} The question remains whether there is substantial evidence supporting the punitive damages award here. As with challenges to factual findings, our review resolves all disputes in favor of the jury's finding, indulging all reasonable inferences in favor of the verdict. *Pub. Serv. Co. of N.M. v. Diamond D Constr., Inc.*, 2001–NMCA–082, ¶ 36, 131 N.M. 100, 33 P.3d 651.

{60} Gallegos argues that the only evidence relevant to the breach of the shareholder agreement and his attendant fiduciary duty is: "that the law firm did not have accounts receivable information; that Gallegos followed the method used to value Oja's vested stock by substituting the available current billing accounts for the unavailable collectible accounts receivable amounts; that Walta had approved this method when the departing shareholder was Oja."

{61} Gallegos asks us to disregard all of the other evidence in the case because, in his view, it is only relevant to the employment claims which were decided in his favor. We disagree with Gallegos' approach. Our

case law makes clear that conduct in a given context should not be unduly compartmentalized when analyzing the sufficiency of evidence to support a verdict. *See Clay v. Ferrellgas, Inc.,* 118 N.M. 266, 269–71, 881 P.2d 11, 15–16 (1994) (holding that consideration of individual employee acts without consideration of the aggregate circumstances is improper); *Hinger v. Parker & Parsley Petroleum Co.,* 120 N.M. 430, 445, 902 P.2d 1033, 1048 (Ct.App.1995) (same).

{62} Here we are not dealing with different persons. Rather, we are dealing with distinguishable relationships involving the same persons. Gallegos asserts that his acts can be neatly severed, one from the other, and then deemed relevant to one cause of action or solely to another. We do not think the evidence can be so neatly separated. And, we think it is improper to attempt to do so. The events surrounding the restructuring of GLF were interconnected. Termination of Walta as an employee and as a shareholder occurred and were dealt with by Gallegos and Walta simultaneously in the same meetings and the same writings. It would be sheer speculation for us to say that a particular act or writing—much less Gallegos' personal motivation—should or can be ascribed to one cause of action or another.

{63} It would be even more speculative and improper to attempt to divine how the jury saw and analyzed the evidence. We cannot know the basis for the jury decision in favor of Gallegos on the employment claims on even the grossest level. Therefore, that verdict cannot be used to say—as Gallegos does—that all evidence conceivably pertinent to the employment claims were resolved in Gallegos' favor and cannot be considered to support the punitive damage award.

{64} Viewing the record in the light most favorable to support the jury verdict, we believe a rational jury could conclude that Gallegos misrepresented his intentions with regard to the restructuring of the firm and that his actions detailed above were motivated by a desire to rid himself only of Walta. Thus, a rational jury could conclude that he improperly exercised his power as the majority shareholder to squeeze the minority shareholder out of her ownership and employment position. A rational jury could find that Gallegos deliberately, improperly, and for no acceptable reason undervalued her shares using a method of valuation clearly contrary to the corporate shareholder agreement while asserting he was following the agreement. A rational jury could find that Gallegos did not properly disclose either his method of valuation or the information material to a proper valuation of the shares until required to do so in this litigation. A rational jury could find that even under his method, Gallegos knowingly undervalued the amount of reasonably collectible accounts receivable. A rational jury could find that Gallegos knowingly failed to conduct himself in a manner consistent with the fiduciary duty he owed to minority shareholders, instead using "hard-ball" tactics more in keeping with arm's-length transactions. Viewing the evidence cumulatively in light of the fiduciary duty applicable, a rational jury could find that Gallegos' conduct was sufficiently culpable to merit punishment. We will not second-guess that assessment.

{65} Finally, Gallegos' argument that ambiguities in the shareholder agreement preclude punitive damages is unavailing. The ultimate question was whether Gallegos' interpretation of the agreement was reasonable, thus precluding a finding of a culpable state of mind. *Pub. Serv. Co. of N.M.* ¶ 43. Gallegos' use of the Oja valuation method would not necessarily be a breach of his duty in the first instance. But, his use of it contrary to his statement that he would follow the by-laws, and his continued adherence to it after Walta voiced her objection, create at least a question of fact for the jury about Gallegos' state of mind.

*CONCLUSION*

{66} Finding no error in the trial court's submission of punitive damages to the jury, and finding substantial evidence to support the jury's verdict, we affirm.

{67} **IT IS SO ORDERED.**

WE CONCUR: RICHARD C. BOSSON, Chief Judge, and A. JOSEPH ALARID, Judge.