2003-NMCA-145

82 P.3d 66

David **MEIBOOM** and Gary Doberman, Plaintiffs–Appellants,

v.

John J. **CARMODY**, Jr., Defendant–Appellee.

No. 22,924.

Court of Appeals of New Mexico.

Oct. 22, 2003.

Certiorari Denied, No. 28,378, Dec. 3, 2003.

Daymon B. Ely, Law Offices of Daymon B. Ely, William Walker, Walker & Van Heijenoort, P.C., Albuquerque, NM, for Appellants.

Emily A. Franke, J. Douglas Compton, Alexander D. Crecca, Butt, Thornton & Baehr, P.C., Albuquerque, NM, for Appellee.

*OPINION*

ALARID, Judge.

{1} In this legal malpractice case, Plaintiffs claim that Defendant mishandled a fraud case against Plaintiffs' former business associate, Mr. Stephan Watson (the underlying case). In the underlying case, Plaintiffs claimed that Watson had defrauded them into taking a lower price for their shares in a close corporation by making false statements that misled them into thinking that the corporation's prospects for a potentially lucrative contract with Levi Strauss & Co. (Levi Strauss) were a year-and-a-half or two years in the future.

{2} The district court granted Defendant partial summary judgment, ruling that Plaintiffs would not have prevailed in the underlying case, so there was no malpractice claim. The district court reasoned that any statements made by Watson were opinions about future events and therefore not actionable. *See Telman v. Galles,* 41 N.M. 56, 61, 63 P.2d 1049, 1052 (1936) (stating the general rule that "fraud must relate to a present or preexisting fact, and cannot ordinarily be predicated on unfulfilled promises or statements as to future events") (internal quotation marks and citation omitted). Consequently, the dispositive issue in this appeal is whether Watson's statements about the prospects of the business are statements of fact or statements of opinion about future events. We hold that there are genuine issues of material fact concerning whether the statements are actionable, and we remand for further proceedings on Plaintiffs' claim that Defendant committed malpractice by mishandling the fraud case.

{3} The district court also granted Defendant partial summary judgment on Plaintiffs' claim that Defendant committed malpractice by failing to sue Watson for breach of contract. This ruling made the summary judgment complete. We reverse this ruling as well.

## BACKGROUND

{4} Plaintiffs, along with Watson, formed a close corporation whose purpose, among other things, was to make paper from recycled denim scraps. Watson was already in the paper business and brought his expertise, Meiboom contributed money, and Doberman was the corporation's accountant. A cornerstone of the business was a planned arrangement to obtain scrap denim from several Levi Strauss manufacturing plants, turn it into paper products such as business cards, letterhead, and envelopes, and sell the paper products back to Levi Strauss. By the Spring of 1991, however, the business was losing money, the shareholders' relationship had disintegrated, and the three agreed to end the relationship.

{5} During negotiations to terminate their business relationship, Watson allegedly told Plaintiffs that any definite arrangement with Levi Strauss would be at least eighteen months to two years in the future. Following negotiations, the three men executed an agreement, dated April 30, 1991, in which Watson agreed to buy out Plaintiffs, and Watson would then continue the business himself. The agreement contained a provision stating that "[t]he parties shall exchange letters containing each party's understanding of the assets and liabilities of the Corporation and the prospects for the Corporation at the time that this agreement was reached on April 4, 1991."

{6} Watson's disclosure statement downplayed the possibility of any deal with Levi Strauss:

With respect to paper products, while Watson has had some conversations with various employees of Levi [Strauss] regarding paper products, there are no con-

tracts between the Corporation or Watson Paper Co. and Levi [Strauss] or any other company. Levi [Strauss] has indicated a desire to purchase $3,500 worth of business cards made of denim paper, but only if the paper meets its specifications. There is no contract for cards.... There is no commitment by Levi [Strauss] to purchase any paper products.... Watson hopes that in the future he will be able to secure contracts with Levi [Strauss] or others for denim paper products, including paper envelopes, cards, paper bags, etc. However, he has no commitment for the purchase of any of these products. Watson intends to work diligently to increase the amount of denim waste which the Corporation recycles from Levi [Strauss], including waste from other Levi [Strauss] plants, with the hope that in the future the Corporation will become the leading supplier of denim rag[s] for paper processing. If the Corporation is able to accomplish this goal, which is speculative and uncertain, Watson believes that the Corporation may be able to obtain a higher price for the waste.

Watson's oral statement that any definite arrangement with Levi Strauss was at least a year-and-a-half away, and the statements in his disclosure statement about the corporation's prospects, have fueled litigation for more than a decade.

{7} After Watson bought them out, Plaintiffs began to feel that they had been defrauded, and Defendant filed suit on their behalf. The suit alleged that Plaintiffs had been defrauded by Watson because he had not truthfully disclosed the corporation's prospects with Levi Strauss, and Plaintiffs had been prejudiced because had they known of the true state of affairs, they would have demanded more money from Watson during the buy out.

{8} The suit achieved nothing. It was voluntarily dismissed in 1995. Plaintiffs allege that, sometime after 1995, they learned their case had been dismissed and claimed they had never authorized dismissal of the suit. They obtained new counsel who tried to set aside the dismissal. That issue made its way to our Supreme Court, and the Court rejected Plaintiffs' attempt to reinstate the case. *See Meiboom v. Watson,* 2000–NMSC–004, ¶¶ 5–41, 128 N.M. 536, 994 P.2d 1154.

{9} In addition to trying to reinstate their case, Plaintiffs also tried to resurrect their suit by filing a new complaint against Watson in 1997 alleging a new theory, breach of contract, against Watson. The district court dismissed that suit, ruling that, no matter how the 1997 suit was framed, in reality it was exactly the same case as the fraud case that had been already dismissed.

{10} Having failed in their attempt to pursue remedies against Watson, Plaintiffs now turn their attention to Defendant, alleging that he mishandled the underlying case by, among other things, dismissing it without their consent, and failing to sue Watson for breach of contract. On the claim that Defendant mishandled the underlying case, Defendant persuaded the district court that partial summary judgment was warranted because Plaintiffs had no fraud case against Watson, and therefore had no malpractice claim against him, either. *See Richardson v. Glass,* 114 N.M. 119, 122, 835 P.2d 835, 838 (1992) (stating that to support an action for legal malpractice, a plaintiff has the burden of showing not only counsel's negligence, but also that the plaintiff would have recovered at trial in the underlying action). Defendant's argument, accepted by the district court, was that any statements made by Watson were not actionable because they were statements of opinion about future events, as opposed to statements of fact. The court granted partial summary judgment in Defendant's favor.

{11} Plaintiffs' suit against Defendant also contained a claim that he committed malpractice by failing to sue Watson for breach of contract. Defendant then obtained summary judgment on that claim, as well, arguing that the breach of contract claim was really the same as the fraud claim, and therefore summary judgment was warranted for the same reason it was in order on the fraud claim.

## DISCUSSION

### A. Standard of Review

{12} Summary judgment is appropriate where there are no genuine issues of materi-

al fact and the moving party is entitled to judgment as a matter of law. *Self v. United Parcel Serv., Inc.*, 1998–NMSC–046, ¶ 6, 126 N.M. 396, 970 P.2d 582. We review this issue de novo. *Id.*

### B. The Underlying Fraud Case

{13} Fraud consists of a misrepresentation of fact, known by the maker to be untrue, made with the intent to deceive and to induce the other party to act on it, and on which the other party relies to his detriment. *Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd.*, 113 N.M. 9, 14, 820 P.2d 1323, 1328 (1991). A failure to disclose information can constitute fraud. *See id.* at 12–13, 820 P.2d at 1326–27 (holding that the defendant's failure to disclose important information about low customer traffic constituted fraud sufficient to justify rescission of a contract); *Mason v. Salomon*, 62 N.M. 425, 428, 311 P.2d 652, 654 (1957) (stating that concealment is the same as an affirmative misrepresentation).

{14} Defendant characterizes Watson's statement that negotiations with Levi Strauss would not bear fruit for eighteen months to two years, and the statements made in Watson's disclosure statement, as opinions about future events, which are not ordinarily actionable. *See Register v. Roberson Constr. Co.*, 106 N.M. 243, 246, 741 P.2d 1364, 1367 (1987) (stating that "an action for fraud will ordinarily not lie as to a pattern of conduct based on promises that future events will take place"); *Telman*, 41 N.M. at 61, 63 P.2d at 1052 (stating the general rule that "fraud must relate to a present or pre-existing fact, and cannot ordinarily be predicated on unfulfilled promises or statements as to future events") (internal quotation marks and citation omitted).

{15} On the other hand, Plaintiffs argue that the statements are actionable because at the time they were made Watson was in possession of facts that made his representations inaccurate and misleading. *See Register*, 106 N.M. at 246, 741 P.2d at 1367 (stating that an exception to the general rule exists where the promise is based on a concealment of known facts); *Telman*, 41 N.M. at 61, 63 P.2d at 1052 (" 'According to the

weight of authority, if the person making the promise or statement as to a future event is guilty of an actual fraudulent intent, and makes the promise or misrepresentation with the intention of deceiving and defrauding the other party, and accomplishes this result, to the latter's injury, fraud may, under many circumstances, be predicated thereon, notwithstanding the future nature of the representations.' ") (citation omitted).

{16} Plaintiffs rely on several items which they contend provide circumstantial evidence that in the Spring of 1991 Watson knew a significant deal with Levi Strauss was close to fruition, but deliberately concealed the true state of affairs. They rely on a purchase order from Levi Strauss dated May 24, 1991(the May 24th purchase order)—less than two months after Watson issued his disclosure statement—in which Levi Strauss agreed to purchase business cards, letterhead, and envelopes for $149,750. A purchase order is a single agreement, whereas a contract is a long-term arrangement. Plaintiffs rely on evidence from Levi Strauss's senior purchasing agent that during the process of generating the purchase order, there would have been discussions back and forth about the corporation's ability to fill any order. The purchasing agent also stated that, given normal channels, issuing a purchase order like the May 24th purchase order would have taken six to eight months. Plaintiffs argue that the purchase order, combined with evidence that such an order could not have happened overnight, supports an inference that at the time of the agreement and disclosure statement Watson knew more about the imminency of a deal with Levi Strauss than he was saying.

{17} Plaintiffs also rely on an article from *Albuquerque Monthly*, dated April 1991, which they contend shows that Watson "was representing to [the magazine] that he had a contract in place with Levi Strauss" in the Spring of 1991. Plaintiffs assert that Watson was telling them one thing at the same time he was telling the magazine another. We do not agree with Plaintiffs' characterization of the article. The article describes the process of recycling denim scraps into paper, mentions that Levi Strauss is "intrigued" by

Watson's proposal, and observes that Watson has been attempting to design a variety of recycled denim paper products such as envelopes, stationery, file folders, bags, and small boxes to suit Levi Strauss. The article does not contain any representation by Watson that he "had a contract in place" with Levi Strauss to provide paper products. It only mentions the plan and that Levi Strauss will have the paper products at some point in the future.

{18} After the May 24th purchase order, negotiations and work continued on an arrangement. The record reflects that between May 1991 and August 1991, Levi Strauss was not satisfied with the paper samples provided by Watson. The May 24th purchase order was not finalized, though Watson was aware of its existence and continued to work on samples that would satisfy Levi Strauss. The May 24th purchase order was superceded by a smaller purchase order, dated August 21, 1991, for $52,375. By December 1991, Watson was able to provide satisfactory samples, and in February 1992—a little less than a year after Watson allegedly told Plaintiffs any deal with Levi Strauss was at least a year-and-a-half away—Levi Strauss entered into a long-term contract with Watson. Under that contract, Levi Strauss agreed to purchase all its business cards, letterhead, and envelopes from Watson for a period of five years.

{19} Defendant argues that Watson's opinions about how long it might take for Levi Strauss, a third party, to contract with the corporation, are precisely the kinds of statements that are not actionable because they forecast future events that are out of Watson's control. He argues that Watson did not commit fraud because only Levi Strauss could know when a deal would materialize. Defendant also argues that Watson's disclosure statement is not fraudulent. He argues it is accurate because, at the time Watson made the statements, Watson had obtained no "contract" with and no "commitment" from Levi Strauss to purchase products, and Watson was accurate when he stated that any future arrangement was "speculative" and "uncertain."

{20} Because this is a summary judgment claim, we view the facts in the light most favorable to the nonmoving party. *See Barber's Super Mkts., Inc. v. Stryker,* 81 N.M. 227, 229, 465 P.2d 284, 286 (1970). Viewing the facts in this manner, we conclude that there is evidence from which a jury could legitimately find that Watson's statements were fraudulent. Watson's statement that nothing would happen for a year and a half or more is a straightforward statement that the corporation's prospect for its deal with Levi Strauss was well in the future. However, the May 24th purchase order, combined with Levi Strauss' senior purchasing agent's testimony that such a purchase order would have taken six to eight months, and would have included discussions between Levi Strauss and the corporation, supports an inference that Watson may have known far more about the advanced and potentially lucrative status of the corporation's prospects with Levi Strauss than Watson was saying. There is no direct evidence of Watson's intent, or his knowledge at the time he made his representations, but fraud is often proven by circumstantial evidence. *See Hummer v. Betenbough,* 75 N.M. 274, 283, 404 P.2d 110, 117 (1965) (recognizing that in fraud cases often only circumstantial evidence is available, because fraud is usually committed in secrecy and "attended with studious efforts to conceal") (internal quotation marks and citation omitted).

{21} Defendant minimizes the importance of the May 24th purchase order, arguing that it was never "binding" and was superceded by a much smaller purchase order, dated August 21, 1991, for $52,375. He argues that no fraud occurred because there was no deal with Levi Strauss until a long-term contract was made in February 1992. We disagree. Even though the May 24th purchase order is not a long-term contract, the evidence reflected that Levi Strauss typically began with purchase orders and, once the company was satisfied, a long-term contract would follow. The May 24th purchase order demonstrates tangible and significant interest on the part of Levi Strauss, whether or not it was eventually superceded by a smaller purchase order in August 1991.

{22} Defendant argues that, for the seven-month period between May and December 1991, Watson was still working to provide Levi Strauss with an acceptable product. He contends that this evidence suggests that any deal was still very much a work in progress and supports his view that Watson did not fraudulently misrepresent the prospects with Levi Strauss. We disagree. The significance of those facts is for the jury to consider. The fact that a large purchase order was issued, approximately two months after Watson's various statements, combined with evidence that these kinds of purchase orders do not happen overnight, can support the opposite inference that Watson knew far more than he was letting on. Of course, the jury is not required to draw that inference, but it would be a permissible one.

{23} Defendant relies on *Canfield v. Rapp & Son, Inc.*, 654 F.2d 459, 466–67 (7th Cir. 1981), to argue that, as a matter of law, Watson's statements were not fraudulent because they were opinions about future events. We disagree that *Canfield* is dispositive here. In *Canfield*, whether the defendant's statements were fraudulent was tried and decided by the district court against the plaintiff. *Id.* at 460. *Canfield* decided only that the district court's determination that the defendant's statements about the future purchase price of government equipment were opinions about future events was supported by substantial evidence. *Id.* at 466–67. *Canfield* does not dictate the outcome of this appeal or require us to hold that there is no factual issue.

{24} Additionally, we are not persuaded that Watson's statement that he had no "contract" and no "commitment" from Levi Strauss, even if technically true, is sufficient to comply with his obligation to disclose material information. The agreement reached with Plaintiffs required Watson to fully and truthfully disclose what he knew. Watson owed that duty to Plaintiffs, not just based on the agreement, but as their fellow shareholder in a close corporation. *See Walta v. Gallegos Law Firm, P.C.*, 2002–NMCA–015, ¶¶ 30–43, 131 N.M. 544, 40 P.3d 449 (recognizing that a close corporation bears a "striking resemblance" to a partnership, and holding that shareholders in close corporation owe each other a fiduciary duty to fully disclose material facts and information relating to the affairs of the business and the value of the stock). A jury could conclude that even though Watson's statements are carefully and cleverly worded so they are technically accurate, his disclosure statement nevertheless failed to give a full and truthful accounting of the true status of the negotiations, and failed to inform Plaintiffs that the prospects with Levi Strauss were better than he was leading Plaintiffs to believe. As a business partner, Watson should not be allowed to hide behind statements that, while technically accurate, may fail to tell the whole story. *See id.*

{25} Nor are we persuaded that Watson's statements that any future deal was "speculative" and "uncertain" are necessarily accurate. In the abstract, the future is always "speculative" and "uncertain," so in that sense Watson's disclaimer is accurate. But we believe that such an analysis is superficial and inconclusive. Some future events are more predictable than others. Sometimes the possession of information makes the future, especially in the short term, more predictable. Where Watson may have had information suggesting that the corporation was on the threshold of a major deal with Levi Strauss, his disclaimer that any future deal was "speculative" does not automatically insulate him from a claim of fraud. It is for a jury to determine, based on all the evidence, whether his statement was accurate, or whether it was deliberately designed to mislead Plaintiffs into taking a reduced price for their shares.

{26} On the other side of the coin, neither is it clear that Watson committed fraud. A jury could legitimately decide that he was not in position to know what was going on inside Levi Strauss, that in April 1991 he did not know what Levi Strauss was about to do, and that any significant progress that occurred soon after that was a pleasant and unexpected surprise. A jury might also conclude that there was no fraud case because even if Watson's assessment of a long-term contract with Levi Strauss missed the actual date by eight months (ten months versus a year and

a half), Watson's inability to predict when the deal would begin providing income did not constitute fraud. However, on these facts, the question is close enough that a jury must determine the disputed issues. The answer is not so clear that summary judgment is appropriate. *See Barber's Super Mkts.*, 81 N.M. at 229, 465 P.2d at 286 (stating that summary judgment is inappropriate if logical but conflicting inferences can be drawn from the facts).

{27} We do not decide that Defendant committed malpractice. We decide only that, on the narrow issue presented to us, there are genuine issues of material fact concerning whether Plaintiffs might have prevailed in the underlying case, and that it is appropriate for a jury to determine the issues of malpractice, proximate cause, and damages.

### C. The Breach of Contract Claim

{28} In addition to granting Defendant summary judgment on Plaintiffs' claim that Defendant mishandled the underlying fraud case, the district court granted Defendant summary judgment on Plaintiffs' alternative theory that Defendant committed malpractice in failing to file a breach of contract claim against Watson. The district court granted summary judgment on this claim ruling that the claim was exactly the same as the fraud and misrepresentation claim. Because the fraud claim was invalid, the breach of contract claim, being the same claim, could not be pursued. Because we reverse the summary judgment with regard to the fraud claim, we reverse the summary judgment with regard to the contract claim.

### CONCLUSION

{29} For these reasons, we reverse the grants summary judgment.

{30} **IT IS SO ORDERED.**

WE CONCUR: LYNN PICKARD and RODERICK T. KENNEDY, Judges.