IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:_____**

**Filing Date:  February 19, 2015**

**NO. 34,286**

**EMRE YEDIDAG, M.D.,**

Plaintiff-Respondent,

v.

**ROSWELL CLINIC CORP. and**
**ROSWELL HOSPITAL CORP.,**

Defendants-Petitioners.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Freddie Joseph Romero, District Judge**

Kemp Smith, L.L.P.
Ken Slavin
Clara B. Burns
Shelly W. Rivas
El Paso, TX

Madison & Mroz, P.A.
William C. Madison
Albuquerque, NM

for Petitioners

Stephen Durkovich
Albuquerque, NM

Tucker Law Firm, P.C.
Steven L. Tucker,
Santa Fe, NM

Bauman, Dow & León, P.C.
Mark Clinton Dow
Simone M. Seiler
Albuquerque, NM

Law Office of Jane B. Yohalem
Jane B. Yohalem
Santa Fe, NM

for Respondent

**OPINION**

**CHÁVEZ, Justice.**

{1}     Respondent Dr. Emre Yedidag was an employee-physician for Roswell Clinic Corp. and Roswell Hospital Corp. (Eastern New Mexico Medical Center). During the peer review of another Eastern employee-physician, Dr. Akbar Ali, Dr. Yedidag questioned Dr. Ali because Dr. Ali was not forthcoming concerning his role in a patient's death. Members of Eastern's executive team reported the exchange to the hospital administration, which precipitated the termination of Dr. Yedidag's employment for unprofessional conduct. Dr. Yedidag then filed a complaint against Eastern for utilizing confidential peer review information to justify his termination. A jury determined that Eastern violated the New Mexico Review Organization Immunity Act (ROIA), NMSA 1978, Sections 41-9-1 to -7 (1979, as amended through 2011), and concluded that this violation proximately caused Dr. Yedidag's damages. The jury also concluded that Eastern breached its employment contract with Dr. Yedidag by terminating him for his participation in a peer review. The jury awarded both compensatory and punitive damages to Dr. Yedidag. The New Mexico Court of Appeals affirmed the verdict. *Yedidag v. Roswell Clinic Corp.*, 2013-NMCA-096, ¶¶ 2, 40, 314 P.3d 243, *cert. granted*, 2013-NMCERT-009.

{2}     On certiorari review, Eastern argues that (1) ROIA does not create a private

cause of action, (2) ROIA did not create an implied promise that Dr. Yedidag would not suffer adverse consequences incident to his participation in the peer review process, and (3) the evidence was insufficient to substantiate the jury's award of punitive damages. We affirm the Court of Appeals and hold that (1) Section 41-9-5(A) creates a private cause of action for breaches of peer review confidentiality when such disclosures do not further any of the listed purposes of ROIA, (2) ROIA is the basis for an implied promise that physician-reviewers will not suffer adverse employment consequences from participation in peer reviews, *see* § 41-9-5(A), because we conclude that contractual agreements incorporate mandatory state law, and (3) the evidence was sufficient for a jury determination of punitive damages because a jury could conclude that Eastern's actions were, at minimum, wanton.

**BACKGROUND**

{3}      On August 14, 2006, eighty-seven-year-old Dorothy Brewington underwent surgery at Eastern to remove two known tumors from her colon. During her surgery, Dr. Ali removed only one of the tumors. This required Ms. Brewington to undergo a second operation to remove the remaining tumor. Complications resulted from both surgeries, and she ultimately died on September 13, 2006.

{4}      This incident was submitted to a peer review committee for review. Dr. Dudley,

2

an Albuquerque private-practice colorectal surgeon and peer-review expert who reviewed the relevant hospital records, testified that the clinical summary submitted to physician reviewers during Dr. Ali's peer review of this incident provided limited information and the summary appeared "slanted" to suggest that the second surgery was necessary to remove a previously unknown third tumor. This case arises out of Dr. Ali's troubling peer review. We first provide some background on peer reviews before discussing the circumstances of Dr. Ali's peer review evaluation. Many facts in this case are contested, and we rely extensively on testimony to frame the parties' conflicting perspectives.

**DISCUSSION**

**I.      Whether ROIA Creates a Cause of Action for Breach of the ROIA Confidentiality Provision**

**A.      The physician peer review process in general**

{5}      Peer reviews are meant to ensure that patients have received adequate care. *See* Brendan A. Sorg, Comment, *Is Meaningful Peer Review Headed Back to Florida?*, 46 Akron L. Rev. 799, 802 (2013) ("Peer review is a process in which the actions of health care providers are reviewed to determine the appropriateness of care that was provided"). During these proceedings, physicians review the actions "of individual physicians and other healthcare professionals appointed to the medical staff of a

3

hospital or other health care organization when there are quality of care concerns with respect to the health care services provided by that individual." Susan O. Scheutzow & Sylvia Lynn Gillis, *Confidentiality and Privilege of Peer Review Information: More Imagined Than Real*, 7 J.L. & Health 169, 172 (1992-1993); *see also* Sorg, *supra*, at 802 ("Peer review is predominately performed by physicians and other health care professionals who are members of a hospital's medical staff."). In order to identify and resolve quality of care issues during a peer review, peer reviewers must have specialized medical expertise. *See id*. at 802-03 ("Functionally, peer review leads to efficient evaluation because practicing physicians have the expertise to evaluate peers' work and are best positioned to review the competence of other practicing physicians they regularly observe.").

{6} In hospitals, "the term 'peer review' describes several distinct activities which are generally performed by a hospital medical staff committee." Katharine Van Tassel, *Hospital Peer Review Standards and Due Process: Moving from Tort Doctrine Toward Contract Principles Based on Clinical Practice Guidelines*, 36 Seton Hall L. Rev. 1179, 1190 (2006). For example, a hospital's medical staff must assemble and assess information concerning the competence and professionalism of the physicians who are seeking hospital staff privileges (such as medical, diagnostic,

emergency room, or surgical privileges that allow a hospital's employee or non-employee physicians to treat the hospital's patients) for the first time or for renewal (the credentialing process). June D. Zellers & Michael R. Poulin, Symposium, *Termination of Hospital Medical Staff Privileges for Economic Reasons: An Appeal for Consistency*, 46 Me. L. Rev. 67, 67-68 (1994). Privileges enable physicians to practice medicine at a hospital. *See* Van Tassel, *supra*, at 1179, 1186-88. Physicians seek privileges when they need to access the resources that hospitals provide. *Id*. at 1187. Physicians who have privileges at a hospital are deemed to be part of the hospital's "medical staff." *See id*. at 1187-88. A peer review is also "commonly triggered by the report of an event or a series of events that raises questions about a physician's clinical competence." *Id*. at 1191. Hospitals tend to have their own unique peer review processes that are laid out in medical staff bylaws, but there are commonalities among hospitals. *Id*.

{7} Normally, "medical staff by-laws are enforceable contracts between the hospital and the members of the medical staff." *Id*. These bylaws "designate those individuals who, or bodies which, can make a request to institute an investigation, referred to either as a complaint or as a request for corrective action." *Id*. at 1191-92. "[B]y-laws will also identify the individuals who, or body which, can make the

5

decision on whether to authorize an investigation." *Id*. at 1192. When "a decision is made to investigate a complaint," usually either the executive committee ("powerful members of the hospital staff") or "an appointed ad hoc committee made up of members of the general medical staff will conduct the investigation." *Id*. at 1185, 1192-93.

{8}     If such an investigation "reveals a physician who is found lacking, informal or formal punitive or restrictive measures may be imposed to bring about improvement in the subject physician's performance." *Id*. at 1190. "Informal measures include self-correction, assistance by colleagues, supervisory oversight and guidance with later re-assessment." *Id*. Formal measures could result in "a suspension of staff privileges until corrective measures are taken by the physician or further education is received by the physician"; restrictions on the scope of the physician's practice in the hospital; or termination of staff privileges altogether. *Id.* at 1190-91.

**B.     Barriers to peer review efficacy and the importance of confidentiality**

{9}     "[E]ffective peer review requires one staff physician who becomes aware of a deficient pattern of care to come forward voluntarily and recommend that action be taken to protect the other physician's patients." Paul L. Scibetta, Note, *Restructuring Hospital-Physician Relations: Patient Care Quality Depends on the Health of*

*Hospital Peer Review*, 51 U. Pitt. L. Rev. 1025, 1033 (1990) (footnote omitted).

> It is thus essential that the reviewing physicians on . . . peer review committees . . . not hesitate [to] act swiftly to alleviate potential injury. . . . Physicians whose poor patterns of care are discovered early could be disciplined, counselled, required to take further education, observed, or assisted in practice to assure that quality of practice is maintained. When problems remain undiscovered for long periods of time and the damage grows more serious, however, the options open to the hospital governing board will necessarily be more limited. In the worst case scenario, permanent suspension would result.

*Id.* Unfortunately, multiple barriers undermine peer review efficacy and threaten the objectivity and frankness of peer review evaluations. *See, e.g.*, *id*. at 1033-35.

{10}    "The most serious obstacle to effective peer review is the potential fear felt by the reviewer that participation in an adverse recommendation will lead to a lawsuit against him or her personally." *Id*. at 1033. This fear is realistic; plaintiff-physicians who have been subjected to negative reviews have brought "antitrust" suits against their reviewers. *Id*. at 1033-34. Although most of these suits have been unsuccessful, "the prospect of having to defend even a meritless claim can chill the willingness of many to recommend the action necessary to improve hospital quality." *Id*. at 1034. Thus, the threat of lawsuits significantly dampens peer reviewer candor.

{11}    Another issue is that peer reviewers may place their livelihoods at risk while conducting reviews. *See id*. at 1034-35. Reviewers face threats to their professional

livelihood from two sources: their peers and their employers. *See id*.; *see also* Maxine M. Harrington, *Revisiting Medical Error: Five Years After the IOM Report, Have Reporting Systems Made a Measurable Difference?*, 15 Health Matrix 329, 332 (2005) ("Efforts to obtain reliable information on medical error have also been hindered by the problem of underreporting, primarily due to fear of malpractice litigation and employer retaliations."). Physician-reviewers are vulnerable to retaliation from their peers because physicians are extremely interdependent on one another within hospitals; the "professional and financial success of each physician depends upon his or her colleagues." Scibetta, *supra*, at 1034. This is because "[i]ncreasing numbers of physicians practice in referral specialties: they must depend on their colleagues to send them patients." *Id*. at 1034-35. Consequently, "[p]hysicians who make important but difficult decisions [a]ffecting fellow practitioners may find that others are reluctant or unwilling to refer to them." *Id.* at 1035. This "situation is bound to chill the enthusiasm of potential peer reviewers." *Id*.

{12}    A final barrier to effective peer review is a physician's workplace friendships. Scibetta, *supra*, at 1035. Physicians develop friendships, and when they review a colleague's practice, they may have close personal ties to the colleague under review.

8

"It is not difficult to surmise the internal conflict that must accompany the initiation of a proceeding which will be [certain] to engender animosity from a personal friend, and may well have serious implications for that friend's career." *Id*.; *see also* Sorg, *supra*, at 805 ("[P]eer review committee members are often direct colleagues or friends with the reviewed physician and understand that a disciplinary recommendation that leads to a termination of clinical privileges may have a devastating effect on the reviewed physician's career, while also ending any friendship."). This situation may be exacerbated in smaller hospitals. *See* Scheutzow, *supra*, at 174 ("Depending upon the size of the health care organization, the individuals performing peer review and the person reviewed may work together on a daily basis and may even practice in the same specialty."). Thus, relationships between physicians also inevitably dampen candor and hinder the objectivity of evaluations.

{13}     One way of overcoming these barriers is to ensure that the peer review process is kept confidential. *See* Sorg, *supra*, at 805-07 (listing the barriers to peer review efficacy and explaining that confidentiality protections are critical for addressing disincentives that prevent aggressive and meaningful peer review). "[C]onfidentiality promotes the candid, free flow of information between physicians who are part of the

9

peer review committee." Alissa Marie Bassler, Comment, *Federal Law Should Keep Pace with States and Recognize A Medical Peer Review Privilege*, 39 Idaho L. Rev. 689, 690 (2003). This is presumably because (1) parties disgruntled by the outcome of a peer review would not know with whom they should be upset, and therefore would be less likely to retaliate, and (2) doctors would speak more candidly when their remarks were kept confidential. *See Ardisana v. Nw. Cmty. Hosp., Inc.*, 795 N.E.2d 964, 969 (Ill. App. Ct. 2003) ("Absent a confidentiality provision, physicians might be reluctant to engage in strict peer review due to a number of apprehensions: loss of referrals, respect, and friends, possible retaliations, vulnerability to tort actions, and fear of malpractice actions in which the records of the peer-review proceedings might be used."); Bassler, *supra*, at 694 ("Physicians would not feel free to openly discuss the performance of other doctors practicing in the hospital, without assurance that their discussions in committee would be confidential" (internal quotation marks and citation omitted)).

**C.    Dr. Ali's peer review at Eastern**

{14}    At Eastern, prior to any peer review meetings, members of the hospital's risk management team review case files to produce summaries. Physician-reviewers then evaluate the case summaries to form preliminary impressions of the cases under

investigation. The reviewers then conduct a peer review meeting to discuss what, if anything, may have gone wrong, ultimately to identify methods of correcting errors to improve future treatment of patients. During peer review meetings, the physician being evaluated may be brought in for questioning when the reviewers believe that he or she may clarify points of confusion in the medical record.

{15} According to a peer review expert, Texas general surgeon Dr. West, and consistent with Dr. Dudley's opinion, Dr. Ali's peer review was probably deficient because the clinical summary submitted to the reviewers omitted Dr. Ali's failure to remove a known tumor. This type of omission is problematic for evaluators because the summary is supposed to frame major problems for their review. Second, information concerning Dr. Ali's peer review leaked out and led to the termination of physician-reviewer Dr. Yedidag's employment. Dr. West explained that when peer review information is leaked, it discourages individuals from participating in peer reviews, and it may dim the candor of the other reviewers. This case hinges on the illegality of Eastern's actions regarding Dr. Yedidag and the statutory protections to which he was entitled as a peer reviewer. We next discuss Dr. Yedidag's tumultuous relationship with Eastern.

**D. Termination of Dr. Yedidag's employment by Eastern**

{16} On September 6, 2005, Dr. Yedidag entered into a three-year surgeon's employment contract at Eastern that could only be terminated for fifteen listed reasons. Eastern hired Dr. Yedidag to build a surgical practice in Roswell to compete with other doctors and guaranteed his $375,000 salary, which meant that Eastern assumed the financial risk of Dr. Yedidag's failure to attract patients.

{17} From Eastern's perspective, Dr. Yedidag "had [a] personality conflict right away with the other existing surgeons and doctors in his practice." Eastern claimed that Dr. Yedidag also failed to "integrate well with the primary care base and network in the community." These social conflicts caused problems for both Dr. Yedidag and Eastern because physicians rely upon referrals from other doctors to generate business, and poor relations with his peers reduced Dr. Yedidag's ability to obtain referrals. Eastern also asserts that Dr. Yedidag engaged in "several testy arguments, yelling incidents and disputes" with a colleague, despite being reprimanded for such behavior.

{18} Dr. Yedidag argues that there was an "inevitable" clash between his "desire to observe rules and do things professionally . . . and Eastern's desire to have its employee-physicians . . . build a surgical practice for Eastern." The record indicates that Eastern's emergency room employees were undertrained and tended to perform

unnecessary and invasive[1] procedures that entail automatic admission of patients, boosting Eastern's profits. Eastern also tended to initially allocate patients, including patients of non-employee-physicians, to its own employee-physicians in a manner that artificially inflated the number of patients Eastern saw. This contravened the hospital's own regulations and created confusion and difficulties for its staff.

{19} On November 15, 2006, Dr. Yedidag's relationship with Eastern reached its breaking point following the peer review meeting concerning Dr. Ali's treatment of Ms. Brewington. During the meeting, Dr. Yedidag questioned Dr. Ali to clarify the circumstances of Ms. Brewington's death and Dr. Ali refused to answer many of Dr. Yedidag's questions. Eastern characterizes Dr. Yedidag's questions as "verbal attacks" that were "heated" and unprecedented for peer review meetings, but failed to provide any specific details to support its characterization. Sara Williamson, who was not a member of the peer review committee but was present during the meeting in an administrative role, reported to Michael Kueker, Eastern's physician practice manager, that Dr. Yedidag had verbally attacked Dr. Ali during the peer review. However, Williamson did not recall "any word that Dr. Yedidag said," and she only

[1]For example, Dr. Yedidag alleged that Eastern employees routinely placed tubes into patients' chest walls which, even if they were not needed by the patients, was profitable for Eastern.

13

had "visual memories of [Dr. Yedidag's] behavior, body language, tone of voice and the way things were being said."

{20}    However, there is evidence that Dr. Ali's peer review was neither uniquely contentious nor unprofessional. Dr. Eric Peterson, who chaired the peer review, testified that although the discussion was heated and probably did not improve relations between Dr. Yedidag and Dr. Ali, Dr. Yedidag's questions were well directed and brought information to the forefront. The peer reviewers could have asked Dr. Peterson to intervene if they thought that the discussion got out of line, but no such request was made. Dr. Petersen did not take action, even though he reportedly "doesn't tolerate unfounded accusations" and "raised voices" in peer review meetings.

{21}    Dr. Peterson's testimony is supported by the observations of Dr. Steven North, who was also present at Dr. Ali's peer review. According to Dr. North, Dr. Yedidag "was not rude in any way." Dr. North believed that while Dr. Yedidag spoke passionately, his passion was not out of the ordinary. From Dr. North's perspective, Dr. Ali's peer review was not unusually contentious.

{22}    Notwithstanding the lack of specifics, Eastern claims that Dr. Yedidag's actions during the peer review process directly contributed to his employment

14

termination. Sara Williamson's report regarding Dr. Yedidag's questioning of Dr. Ali is what precipitated Dr. Yedidag's termination. In its brief Eastern contends that Dr. Yedidag was terminated "based on [his] repeated unprofessional behavior and repeated warnings to cease such behavior."

{23} Despite this contention, there is evidence that Eastern's commercial interests precipitated Dr. Yedidag's employment termination following a peer review meeting where employee and non-employee physicians who compete for patients served as peer reviewers. When Dr. Yedidag tried to explain his side of the story to Mr. Kueker, Mr. Kueker told Dr. Yedidag that he "[didn't] need to know" and he "[didn't] really want to know," because "in an environment where [Eastern has] a sensitive competition going between [a] group of surgeons in one camp and [Eastern's] surgeons in the other, for one of [Eastern's] surgeons to attack his [colleague] in that meeting in front of other people who are in the other camp" is problematic. Mr. Kueker also claims that he simply did not want his physicians to attack each another.

{24} Eastern terminated Dr. Yedidag's employment pursuant to grounds 10.1(j), 10.1(k), and 10.1(m) of his employment contract. These grounds provide, respectively, that Eastern may terminate the employment of a physician (1) whose continued employment either "pose[d] an unreasonable risk of harm to patients or

15

others" or "adversely affect[ed] the confidence of the public in the services provided by [Eastern];" (2) who "engaged in gross insubordination or gross dereliction of duty;" or (3) whose conduct was reasonably determined "to be unethical, unprofessional, fraudulent, unlawful, or adverse to the interest, reputation or business of [Eastern]."

{25}    Mr. Kueker claims that these grounds for termination were proper because (1) Dr. Yedidag reduced public confidence in Eastern's services by arguing with his peers, (2) Dr. Yedidag was insubordinate in failing to heed repeated warnings concerning his allegedly inappropriate behavior, and (3) Dr. Yedidag engaged in unprofessional behavior that was adverse to Eastern's interest. However, Mr. Kueker admitted that not all of the grounds listed in the termination clauses of the contract actually justified terminating Dr. Yedidag's employment. For example, Mr. Kueker admitted that to his knowledge, Dr. Yedidag never placed any patients in danger.

{26}    In his termination letter, Mr. Kueker did not clarify that he only relied on portions of the termination clauses to justify Dr. Yedidag's employment termination. Dr. Yedidag testified that as a result of the letter, prospective employers could have believed that he posed "an unreasonable risk of harm to patients," even though his employment was not terminated for endangering patients. The letter rendered Dr.

16

Yedidag almost unemployable by other hospitals. He was in fact summarily rejected from many jobs after potential employers learned about the conditions under which he was terminated. Mr. Kueker was aware that this situation could arise as a result of Dr. Yedidag's termination.

{27} After these events, Dr. Yedidag filed an amended complaint against Eastern on claims arising from his termination. A jury found that Eastern violated ROIA, which proximately caused Dr. Yedidag's damages, and that Eastern breached its employment contract with Dr. Yedidag. With respect to Eastern's breach of contract, the jury specifically found that "Eastern breached its implied promise that there would be no adverse consequences to Dr. Yedidag's employment or staff privileges as a consequence of his participation in the peer review process." The jury then awarded Dr. Yedidag compensatory and punitive damages. The New Mexico Court of Appeals affirmed the verdict. *Yedidag*, 2013-NMCA-096, ¶¶ 2, 40. We granted certiorari review and affirm the Court of Appeals. 2013-NMCERT-009.

**E.     The ROIA confidentiality provision creates a cause of action**

{28}     This case hinges on whether Section 41-9-5(A), the ROIA confidentiality provision, creates a private cause of action, which is a question of law we review de novo. *See Sedillo v. State, Dep't of Pub. Safety*, 2007-NMCA-002, ¶ 7, 140 N.M. 858,

17

149 P.3d 955 ("The question of whether statutes create or imply a private right of action is a question of law . . . reviewed de novo."). We first provide an overview of ROIA.

{29}   ROIA regulates hospital peer review committees, which gather and review information concerning the care and treatment of patients for eight purposes. Section 41-9-2(E). The listed purposes are:

> (1)   evaluating and improving the quality of health care services rendered in the area or by a health care provider;
> (2)   reducing morbidity or mortality;
> (3)   obtaining and disseminating statistics and information relative to the treatment and prevention of diseases, illnesses and injuries;
> (4)   developing and publishing guidelines showing the norms of health care services in the area or by health care providers;
> (5)   developing and publishing guidelines designed to keep within reasonable bounds the cost of health care services;
> (6)   reviewing the nature, quality or cost of health care services provided to enrollees of health maintenance organizations and nonprofit health care plans;
> (7)   acting as a professional standards review organization pursuant to 42 U.S.C., Section 1320c-1, et seq.; or
> (8)   determining whether a health care provider shall be granted authority to provide health care services using the health care provider's facilities or whether a health care provider's privileges should be limited, suspended or revoked.

Section 41-9-2(E). These purposes necessarily include gathering and evaluating treatment data, defining and enforcing professional standards, and evaluating and

18

improving the quality of healthcare services in the area. *Id*. ROIA is meant to improve New Mexico health care. *Sw. Cmty. Health Servs. v. Smith*, 1988-NMSC-035, ¶ 7, 107 N.M. 196, 755 P.2d 40 ("ROIA establishes a medical peer review process to promote the improvement of health care in New Mexico."). However, peer reviews are only efficacious when they are conducted with objectivity and candor. *Id.* ("[ROIA] recognizes that candor and objectivity in the critical evaluation of medical professionals by medical professionals is necessary for the efficacy of the review process."). To promote objectivity and candor, ROIA grants qualified immunity to both peer reviewers and individuals who provide information to review organizations. *See* § 41-9-3 ("No person providing information to a review organization shall be subject to any action for damages or other relief . . . unless such information is false and the person providing such information knew or had reason to believe such information was false."); § 41-9-4 (providing that peer reviewers shall not be liable "for damages or other relief in any action brought by . . . persons whose activities have been or are being scrutinized or reviewed by a review organization . . . unless the performance of such duty, function or activity was done with malice toward the person affected thereby"); *Leyba v. Renger*, 1992-NMSC-061, ¶¶ 5-6, 114 N.M. 686, 845 P.2d 780 (recognizing that ROIA establishes qualified immunity).

19

{30}     ROIA also protects the confidentiality of peer review records. *See Sw. Cmty. Health Servs.*, 1988-NMSC-035, ¶ 10 ( "Section 41-9-5 precludes any party from using for purposes of civil litigation the confidential records of peer review proceedings"). Section 41-9-5(A) protects peer review confidentiality and provides that

> [a]ll data and information acquired by a review organization in the exercise of its duties and functions shall be held in confidence and shall not be disclosed to anyone *except to the extent necessary to carry out one or more of the purposes* of the review organization or in a judicial appeal from the action of the review organization.

(Emphasis added.) Although this provision does not explicitly provide a private remedy, we must determine whether a cause of action is implied.

{31}     Our determination of whether to imply a private cause of action is influenced by three of four factors set out in *Cort v. Ash*, 422 U.S. 66, 78 (1975). *See Nat'l Trust*, 1994-NMCA-057, ¶¶ 7, 11 (listing the *Cort* factors and stating that the first three *Cort* factors, while not irrelevant, do not exclusively determine whether to imply a cause of action). These three factors are

> (1) Was the statute enacted for the special benefit of a class of which the plaintiff is a member? (2) Is there any indication of legislative intent, explicit or implicit, to create or deny a private remedy? [and] (3) Would a private remedy either frustrate or assist the underlying purpose of the legislative scheme?

*Nat'l Trust for Historic Pres. v. City of Albuquerque*, 1994-NMCA-057, ¶ 7, 117 N.M. 590, 874 P.2d 798 (internal quotation marks and citation omitted).

**1.      *Whether Dr. Yedidag is a member of the class protected by ROIA***

{32}      The first *Cort* factor favors Dr. Yedidag because he is a member of the class protected by ROIA. Eastern argues that the ROIA qualified immunity provision, which protects peer reviewers from claims brought by the physicians they evaluate, is the only ROIA protection to which Dr. Yedidag is entitled. Eastern therefore contends that Dr. Yedidag is not a member of the protected class because Dr. Ali, the person Dr. Yedidag evaluated, did not sue Dr. Yedidag. Eastern's argument is contrary to the text and policy contained in ROIA, and its argument also ignores industry realities.

{33}      Section 41-9-5(A) expressly guarantees the confidentiality of what "transpired" during peer review meetings. The plain text in ROIA provides a blanket confidentiality provision for peer review proceedings; it does not state that physician-reviewers are only protected when they are being sued by their reviewed peers. *See* §§ 41-9-3 to -7.

{34}      Retaliation against peer reviewers can arise from many different sources. *See Ardisana*, 795 N.E.2d at 969 (listing some of the apprehensions physicians may

experience as a result of their participation in peer reviews). For example, physicians may lose "referrals, respect, and friends" in their community. *Id*. These concerns may undermine the rigor of physician peer reviews, and a blanket confidentiality provision that provides protection for physician-reviewers helps ensure candid peer reviews. *See* Gregory G. Gosfield, Comment, *Medical Peer Review Protection in the Health Care Industry*, 52 Temp. L.Q. 552, 558 (1979) (noting that lawmakers seek to avert the ambivalence experienced by physicians when performing strict peer reviews "by shielding peer review deliberations from legal attacks" and describing how this ambivalence arises from numerous sources).

{35}     The instant case demonstrates that retaliation can arise from sources other than poorly reviewed physicians. Dr. Yedidag's expert, Dr. West, testified that peer review information should not be made available to members of the public, including employers, under any circumstances, and that leaked information can undermine the peer review process by provoking retaliation from parties including the reviewed doctors, their friends, and their families. *See Ardisana*, 795 N.E.2d at 969 (noting possible "loss of referrals, respect, and friends, possible retaliations, vulnerability to tort actions, and fear of malpractice actions" as sources of physicians' reluctance to participate in a peer review process). Employers also may retaliate against those who

disclose information concerning medical errors and their employers' misdeeds because employers want to protect their financial interests and reputations. *See* Harrington, *supra*, at 332; *Terzano v. Wayne Cnty.*, 549 N.W.2d 606, 611 (Mich. Ct. App. 1996) (noting that employers engage in retaliatory actions when their employees reveal information about the misdeeds of other employees or of the employer that harms the employer's financial interests).

{36}     Not surprisingly, physicians who have been found responsible for providing substandard care often experience a decrease in business. *See* Alex Stein, *Toward A Theory of Medical Malpractice*, 97 Iowa L. Rev. 1201, 1242 (2012) (noting that physicians who have been found responsible for malpractice face negative peer reviews and expulsion from patient-referral networks and that these consequences often destroy such physicians' businesses); *see also Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 220 (2d Cir. 2008) (noting that undeserved negative performance reviews caused "serious damage" to a physician's career prospects). Employee-physicians' abilities to generate revenue for their hospital-employer depend, in part, on the number of referrals they receive. *See* Robert Kocker & Nikhil R. Sahni, *Hospitals' Race to Employ Physicians—The Logic behind a Money-Losing Proposition*, 364 New Eng. J. Med. 1790, 1791 (2011) (noting that hospitals "expect

to [make] money on employed physicians when they account for the value of all care, tests, and referrals"). Eastern admits that poor reviews of a hospital's employee-physician may harm the hospital's profitability. Consequently, employee-physician reviewers who provide negative reviews of their colleagues foreseeably risk retaliation from their employers because such reviews harm their employers' financial interests.

{37}     We hold that peer reviewers are a protected class of individuals under ROIA, regardless of whether the retaliatory entity is a reviewed physician, a hospital, or any other person or entity. In this case Dr. Yedidag was a peer reviewer, and he is entitled to the protections contained in ROIA, including its confidentiality provision.

**2.     *Whether there was legislative intent to create or deny a remedy***

{38}     The second *Cort* factor favors Dr. Yedidag because the Legislature intended that ROIA create a cause of action for breaches of its confidentiality provision. Eastern advances two arguments to the contrary. First, Eastern argues that because the Legislature failed to specifically provide for a civil cause of action, there is an inference that it did not intend to create one. Second, Eastern argues that whereas medical information discussed during peer reviews is confidential, the conduct of the peer reviewers is not.

{39}    Eastern's first argument is inconsistent with New Mexico case law. *National Trust* indicates that the omission of an express cause of action by a legislature does not necessarily prohibit an implied cause of action. *See* 1994-NMCA-057, ¶¶ 6, 14-15 (recognizing that "a statute may explicitly deny a private cause of action" and "it may be appropriate to deny standing when recognition of a private cause of action would undermine the effective functioning of a statutory scheme," but nevertheless enabling the plaintiffs to bring an action, although there was no "explicit statutory directive" enabling them to do so).

{40}    Eastern's second argument is inconsistent with ROIA. Section 41-9-5 does not distinguish information from conduct. The confidentiality provision precludes the disclosure of "what transpired" during the peer review meeting unless (1) disclosure would further the purposes of either peer review or judicial review of peer review actions, or (2) the medical board subpoenas individuals on what transpired during a peer review. Section 41-9-5. The term "transpire" means to "happen" or "occur." *Webster's Third New International Dictionary of the English Language Unabridged* 2430 (1971). Conduct is something that transpires at peer reviews. ROIA does not provide a basis for the distinction asserted by Eastern.

{41}    Despite Eastern's arguments, we conclude that the Legislature intended to

25

create an implied cause of action. As a general rule, "[a] disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover the damages . . . is *implied*." *Tex. & Pac. Ry. Co. v. Rigsby*, 241 U.S. 33, 39 (1916) (emphasis added).

**3.** ***Whether an implied cause of action furthers or frustrates the purpose of the confidentiality provision***

{42}     We conclude that the third *Cort* factor also favors Dr. Yedidag because without a private cause of action, the minimal criminal penalty provided in Section 41-9-6 of ROIA will not adequately guarantee peer review confidentiality. Generally, when a plaintiff's interests fall "within the class that the statute was intended to protect" and when "the harm that had occurred was of the type that the statute was intended to forestall," civil actions are proper because "criminal liability [is] inadequate to ensure the full effectiveness of [a] statute." *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 202 (1967); *see also* Junping Han, Note, *The Constitutionality of Oregon's Split-Recovery Punitive Damages Statute*, 38 Willamette L. Rev. 477, 486 (2002) (noting that scarce resources for public prosecution means that private prosecutors play an important role in vindicating wrongdoings). In this case, ROIA was meant to protect Dr. Yedidag, and a jury concluded that Eastern had violated ROIA. Upholding peer review integrity under ROIA is best accomplished with an implied civil cause

26

of action for violations of peer review confidentiality because such violations are not necessarily prosecuted by the State.

{43}     All three *Cort* factors support our holding that ROIA creates a private cause of action for breach of the confidentiality provisions. Dr. Yedidag is a member of the protected class under ROIA. Eastern used confidential information concerning Dr. Yedidag's conduct during Dr. Ali's peer review to terminate Dr. Yedidag's employment. The acquisition and use of confidential peer review information for purposes of employee discipline is not a statutorily permissible use of peer review information, *see* § 41-9-5(A), and Dr. Yedidag's right to confidentiality was violated. We therefore conclude that Dr. Yedidag can avail himself of an implied cause of action.

{44}     Our holding limits the use of peer review information for a statutory purpose, *see* § 41-9-5(A), and only those individuals responsible for furthering the statutory purposes of ROIA can be privy to such information. *See* § 41-9-5 (noting that *no person* can utilize peer review information except to carry out the statutorily enumerated purposes of a *review organization*). Eastern contends that our holding will completely immunize physician-reviewer conduct in peer reviews, "no matter how egregious." This argument ignores the dual regulatory structure within hospitals.

As will be explained, because only medical staff, not hospital administrators, are responsible for peer reviews, medical staff may utilize information concerning peer reviewer conduct to discipline reviewers.

{45}   The medical staff in a hospital is composed of both the hospital's employee-physicians and non-employee physicians who have been granted staff privileges. *See* Zellers & Poulin, *supra*, at 67 (noting that both employee-physicians and non-employee-physicians have medical staff privileges at hospitals). Both types of physicians require medical staff privileges to work at a hospital. *Id.* Physicians receive privileges to work at a hospital once the medical staff determines that the physician is professionally qualified or credentialed. Van Tassel, *supra*, at 1190. Credentialing decisions traditionally were based "solely on professional notions of medical competence" as opposed to "factors unrelated to the quality of care or physician competence." Tracy A. Powell, *The Permissibility of Conflicts Credentialing (a/k/a Economic Credentialing) by Traditional Hospitals as a Response to the Growth of Specialty Hospitals*, 20 Health Law. 17, 17 (2007). Typical credentialing requirements include the "lack of a prior adverse record by the physician, and . . . qualifications specifying licenses, insurance, [and] performance and training standards." John Hulston, et. al., *Do Hospital Medical Staff Bylaws*

28

*Create a Contract?*, 51 J. Mo. B. 352, 352 (1995).

{46} Employment regulations reflect employer interests that are separate from those covered under medical staff bylaws, the latter being designed to further quality of care. *See* Zellers, *supra*, at 70-71. For example, "a hospital may . . . control access to its equipment and staff on the basis of its own economic interests" and it may do so "not through the credentialing process but through its contracts with physicians for certain services." *Id*. at 71; *see, e.g.*, *Adler v. Montefiore Hosp. Ass'n of W. Pennsylvania*, 311 A.2d 634, 645 (Pa. 1973) (distinguishing between medical staff bylaw regulations and the conditions imposed by an employer-employee contract and holding that the cancellation of an employee-physician's rights to perform certain procedures utilizing hospital equipment, which were granted by his or her employer-employee contract, did not implicate the privileges granted by the medical staff, and therefore did not entitle the physician to protections provided by the medical staff bylaws); Zellers, *supra*, at 73, 77-78 (discussing Adler and noting that physicians often rely on two different contracts to protect their interests within the hospital setting: "(1) the employment . . . contract between the hospital and the physician; and (2) the contract created by the medical staff bylaws").

{47} Eastern has a dual regulatory system whereby its employee-physicians are held

accountable to both medical staff bylaws and employee-physician contracts. A doctor who is employed at Eastern is not allowed to work at the hospital until its medical staff determines that the doctor is professionally qualified to fulfill the functions for which he or she is to be hired. The final decisions concerning either the grant or revocation of staff privileges rests with Eastern's credentialing committee. Furthermore, the Eastern medical staff drives the peer review process and creates the bylaws necessary to regulate that process. On the other hand, Eastern administrators in charge of employment matters have only clerical connections with medical staffing decisions, and they are not responsible for regulating peer reviewer conduct. Eastern admits that hospital administrators participating in peer reviews are not members of peer review committees and they do not possess any voting power on these committees. Hospital administrator involvement in peer reviews at Eastern is limited to collecting data and making decisions concerning "what needs to go to [the peer review] committee meeting."

{48}     In light of the aforesaid dual regulatory structure, Eastern's argument that our holding immunizes egregious conduct lacks merit because it ignores the authority of the medical staff who have their own rules concerning peer reviews. *See* Anthony W. Rodgers, Comment, *Procedural Protections During Medical Peer Review: A*

*Reinterpretation of the Health Care Quality Improvement Act of 1986*, 111 Penn St. L. Rev. 1047, 1061 (2007) ("Hospital bylaws govern the relationship between medical practitioners and the hospital" such that "[t]hese bylaws also frequently set out the procedure for the peer review process"); Eleanor D. Kinney, *Hospital Peer Review of Physicians: Does Statutory Immunity Increase Risk of Unwarranted Professional Injury?*, 13 Mich. St. U. J. Med. & L. 57, 60-62 (2009) (noting that the accrediting body for hospitals, the Joint Commission on the Accreditation of Health Care Organizations (JCAHO), requires that "medical staff must create medical staff by-laws that describe the organizational structure of the medical staff and the rules for its self-governance" and discussing the fact that JCAHO "require[s] accredited organizations to create a code of conduct that defines acceptable and unacceptable behaviors, and to establish a formal process for managing unacceptable behavior"). Eastern's medical staff have regulations concerning disruptive conduct. The chair of an Eastern peer review committee can intervene at any time to stop inappropriate behavior. Particularly egregious behavior could trigger the termination of a physician's privileges. *See, e.g.*, Kinney, *supra*, at 58 (citing a situation where a peer review panel revoked a physician's privileges partially based on disruptive conduct). At Eastern, the loss of such privileges terminates the employment of its

physician-employees. ROIA explicitly allows reviewed physicians to bring claims against their evaluators for malicious peer review conduct. *See* § 41-9-4 (providing that immunity from claims brought by reviewed physicians only attaches when the conduct is not malicious); *Leyba*, 1992-NMSC-061, ¶ 13 (noting that immunity is qualified because "members of peer review committees are often in direct competition with those being reviewed, and the system has the potential for abuse of the person being reviewed."). Thus, unprofessional peer reviewers face multiple avenues of discipline that regulate disruptive conduct, albeit not by hospital administrators who are not privy to what transpires during peer review meetings.[2]

{49}     Minimizing the inappropriate conduct of peer reviewers improves the peer review process. Kinney, *supra*, at 79-80 ("Obviously, not every peer review of a physician is unwarranted, abusive or malicious. No doubt badly behaved physicians can pose a threat to patient safety and the smooth operation of health care facilities. And legal immunity does protect physicians participating in peer review from

---

[2]We also note that if Dr. Yedidag had actually engaged in repetitive unprofessional conduct, Eastern perhaps could have acquired information concerning Dr. Yedidag's conduct outside of the peer review to terminate his employment. Mr. Kueker claimed that Dr. Yedidag was terminated not only because of his behavior during the peer review meeting, but also because of "a long string of events where his behavior was inappropriate." Some of these alleged events were supposed to have occurred outside of the peer review context. Therefore, Eastern did not have to resort to piercing the confidentiality of a peer review meeting.

32

lawsuits by appropriately sanctioned physicians. However, the processes for regulating physician conduct should be designed to operate in a fair manner with respect to physicians while assuring protection of the public."). Thus, utilizing information concerning peer review conduct to prevent abusive review proceedings furthers the purposes of the peer review process. While inappropriate behavior during a peer review is still confidential under ROIA[3], the statute enables medical staff to utilize such information to discipline reviewers.

## II. ROIA Is the Basis for an Implied Promise that Dr. Yedidag Would Not Suffer Adverse Employment Consequences Stemming from His Participation in Peer Review

{50}    Dr. Yedidag argues that ROIA provides a basis to imply, as a matter of law, that there would not be any adverse consequences to his employment resulting from his actions during the peer review process. Eastern disagrees. Whether there was an implied promise is a question of law that we review de novo. *See, e.g.*, *Taylor Equip., Inc. v. John Deere Co.*, 98 F.3d 1028, 1031 (8th Cir. 1996) (reviewing the application of an implied covenant de novo). The issue hinges on whether the ROIA

---

[3]Eastern argues that the jury instructions improperly left the jury "with no alternative than to find [that] Dr. Yedidag's unprofessional conduct was confidential." In light of our holding, we note that the trial court had no alternative but to issue the jury instructions as they were because the professionalism of Dr. Yedidag's behavior does not impact the confidentiality of his conduct.

33

confidentiality provision is either a mandatory or a default rule of law. *See* Ian Ayres, Responses, *Valuing Modern Contract Scholarship*, 112 Yale L.J. 881, 885-86 (2003) (discussing the distinction between mandatory and default contract rules).

{51} Generally, "[t]he employer-employee relationship is a contractual [one] wherein the parties may negotiate the terms thereof and agree to any terms not prohibited by law or public policy." *Whipple v. McDonald's Rest. Managers*, 2007-731, p. 3 (La. App. 3 Cir. 12/5/07); 971 So. 2d 431, 433 (internal quotation marks and citation omitted). Where a contract is silent on an issue, courts apply default rules supplied by law. *Id*. Mandatory rules of law prohibit the contracting of certain terms as violating public policy. Default rules supply terms that fill the gaps concerning issues on which parties can freely contract. Whether a statutory requirement is mandatory is a question of legislative intent. *Vaughan v. John C. Winston Co.*, 83 F.2d 370, 372 (10th Cir. 1936) ("Whether a statutory requirement is mandatory in the sense that failure to comply therewith vitiates the action taken . . . can only be determined by ascertaining the legislative intent."). "If a requirement is so essential a part of the plan that the legislative intent would be frustrated by a noncompliance, then it is mandatory." *Id*.

{52} ROIA does not explicitly preclude employer retaliation for peer review

34

participation. However, because Section 41-9-5 states that information concerning peer review can only be utilized for the purposes listed in the statute, ROIA precludes the usage of peer review information, *id.*, to justify adverse employment consequences. Section 41-9-5 prohibits an employer from retaliating against a physician who participates in a peer review because the unlawful acquisition and utilization of peer review information is a factual prerequisite to such retaliation. Our analysis therefore focuses on whether Section 41-9-5 is a mandatory rule of law.

{53}  By its plain language, Section 41-9-5 is a mandatory rule of law. Section 41-9-5(A) states that "[n]o person . . . *shall* disclose what transpired at a meeting of a review organization" except for the purposes listed in the statute. (Emphasis added.) "The word 'shall' is ordinarily '[t]he language of command.' And when [a law] uses . . . 'shall', the normal inference is that [it] is used in its usual sense—[that] being . . . mandatory." *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947) (citation omitted).

{54}  The ROIA regulatory scheme, which aims to promote peer review integrity by promoting candor and objectivity, also strongly suggests that Section 41-9-5 is a mandatory rule. *See Sw. Cmty. Health Servs.*, 1988-NMSC-035, ¶ 7 (ROIA "recognizes that candor and objectivity in the critical evaluation of medical professionals by medical professionals is necessary for the efficacy of the review

35

process."). Candor and objectivity are greatly furthered when reviewers are protected by a confidentiality provision. *See* Sorg, *supra*, at 803-04. Allowing entities to contract around the confidentiality provision would undermine the entire regulatory scheme because the confidentiality of an entire group can be destroyed by one individual. The presence of one peer review participant who is not bound by the ROIA confidentiality provision could chill the candor of an entire peer review panel. We therefore hold that Section 41-9-5 is a mandatory rule of law incorporated into physician-reviewer employment contracts. A mandatory rule of law, by definition, precludes parties from contractually avoiding application of the rule. *See* Ayres, *supra*, at 881, 885-86. However, our holding does not conflict with Eastern's contractual provisions enabling termination of employment for cause. Our holding merely prevents Eastern from using confidential peer review information in making its personnel decisions.

**III.    The Evidence Was Sufficient for a Jury Determination of Punitive Damages Because a Jury Could Have Concluded that Eastern's Profit Motives Made Eastern's Actions, at the Very Least, Wanton**

{55}    Eastern argues that "Dr. Yedidag failed to meet his burden to substantiate" a punitive damages award based on its alleged ROIA violation. We disagree. A jury could find that at the very least, Eastern acted wantonly in terminating Dr. Yedidag's

36

employment based on his conduct during the peer review of Dr. Ali.

{56} In New Mexico, a punitive damages award will be upheld if substantial evidence supports the jury's finding. *Aken v. Plains Elec. Generation & Transmission Co-op., Inc.*, 2002-NMSC-021, ¶ 17, 132 N.M. 401, 49 P.3d 662. In doing so, we resolve all disputed facts and indulge all reasonable inferences in favor of the judgment. *Chavarria v. Fleetwood Retail Corp.*, 2006-NMSC-046, ¶ 23, 140 N.M. 478, 486, 143 P.3d 717.

{57} Eastern argues that punitive damages are not justified when Eastern could not have known that it violated ROIA when it terminated Dr. Yedidag's employment because (1) the issue of whether the confidentiality provision protected Dr. Yedidag's conduct was a matter of first impression for New Mexico courts, and (2) Mr. Kueker had consulted with attorneys concerning whether terminating Dr. Yedidag was permissible under the circumstances. These arguments are not persuasive.

{58} In New Mexico, the award of punitive damages requires a culpable mental state because such damages aim to punish and deter "culpable conduct beyond that necessary to establish the underlying cause of action." *Walta v. Gallegos Law Firm, P.C.*, 2002-NMCA-015, ¶ 56, 131 N.M. 544, 40 P.3d 449. Punitive damages are awarded when a party intentionally or knowingly commits wrongs. *See* UJI 13-1827

NMRA. However, punitive damages are also imposed when a defendant is utterly indifferent to the plaintiff's rights, even if the defendant lacked actual knowledge that his or her conduct would violate those rights. *See Kennedy v. Dexter Consol. Sch.*, 2000-NMSC-025, ¶ 32, 129 N.M. 436, 10 P.3d 115. For example, reckless and wanton conduct merits punitive damages, but does not involve actual knowledge of the violations. UJI 13-1827. "Reckless conduct is the intentional doing of an act with utter indifference to the consequences." *Id*. Similarly, "[w]anton conduct is the doing of an act with utter indifference to or conscious disregard for a person's [rights]." *Id*.

{59} There is sufficient evidence to reasonably infer that Eastern acted wantonly in violating Dr. Yedidag's right to confidentiality. A jury could have found that (1) Eastern had significant reasons to suspect that Dr. Yedidag's rights would have been violated by any potential termination of his employment based on peer review conduct, and (2) Eastern was utterly indifferent to the risk of violating those rights.

{60} Both the plain text of ROIA and physician-reviewer norms state that Dr. Yedidag had a right to confidentiality in the context of a peer review. ROIA enhances peer review efficacy by promoting candor through its confidentiality provision. *See Sw. Cmty. Health Servs.*, 1988-NMSC-035, ¶ 7; Sorg, *supra*, at 805-07. ROIA also explicitly states that peer review information can only be utilized to effectuate the

purposes listed in the statute, which do not encompass employment discharge of peer reviewers. *See* §§ 41-9-5, 41-9-2(E). Eastern utilized peer review information to justify terminating Dr. Yedidag's employment, even though employment matters concerning peer reviewers clearly fall outside the scope of the intended purposes of ROIA. *See id.* Furthermore, the record reveals that two physicians, who were also peer reviewers during the subject peer review meeting, were somewhat bewildered when Dr. Yedidag's right of confidentiality was breached during the course of his termination. These facts indicate that Eastern should have been on notice to the possibility that its termination of Dr. Yedidag violated the ROIA confidentiality provision and were utterly indifferent to the consequences. Eastern's breach of the ROIA confidentiality provision was shocking to the physician-reviewers who recognized the potential for employer retaliation to undermine peer review candor. *See* Harrington, *supra*, at 332 (noting that fear of employment retaliation makes individuals less willing to disclose information concerning medical errors). This consequence is inconsistent with both ROIA policies and the resulting limitations on the utilization of confidential peer review information. The foreseeable consequence of disrupting peer review candor should have warned Eastern that it needed to thoroughly scrutinize the legality of its actions.

39

{61} Despite the obvious risks of terminating Dr. Yedidag's employment on the basis of confidential peer review information, the evidence in the record indicates that Eastern was utterly indifferent to the risks. First, Eastern did not proffer any advice of counsel letter on which it relied in making its decision to terminate Dr. Yedidag. In fact, Eastern does not offer any documentation of reliance on counsel. A defendant who was attentive to others' rights would have obtained documentation supporting its reliance on an erroneous interpretation of law. *See Scalise v. Nat'l Util. Serv., Inc.*, 120 F.2d 938, 941-42 (5th Cir. 1941) (noting that "advice of counsel is not a defense [to recovery of punitive damages] unless it appears as a matter of fact that it was requested in good faith and upon full disclosure, and was given in good faith in regard to a course where legal questions . . . are involved"). Second, Mr. Kueker appeared to have weak factual bases for Dr. Yedidag's termination. Mr. Kueker did not seek further opinions from anyone concerning Dr. Yedidag's peer review conduct and could not recall any "specific words" that justified characterizing Dr. Yedidag's conduct during the peer review meeting as inappropriate. Mr. Kueker admitted that his recollection of the events was "fuzzy." His vagueness concerning the factual bases for Dr. Yedidag's termination suggests that Eastern lacked sufficient facts with which to support a good faith legal opinion justifying Dr. Yedidag's termination. Third, if

Dr. Yedidag had continuously engaged in unprofessional behavior, Eastern should have relied on documented conduct outside of the peer review meeting to justify terminating his employment, thereby avoiding potential ROIA violations. However, the record reveals no attempt by Eastern to seek out alternative facts to justify Dr. Yedidag's termination. In light of Eastern's conduct, a jury could reasonably infer that Eastern was utterly indifferent to Dr. Yedidag's rights.

{62}     In addition to these oversights, the evidence before us is more egregious than Eastern claims. A jury could readily find that Eastern was not forthright in asserting that it had terminated Dr. Yedidag's employment because of his unprofessional conduct. Notably Sara Williamson, who reported the incident to Mr. Kueker, was never asked to document the occurrence. However, such documentation appears to be part of Eastern's standard protocol for discharge. This suggests that Dr. Yedidag's actual peer review conduct had nothing to do with his discharge. In addition, the record does not reveal that Dr. Ali was disciplined despite his unwillingness to fully disclose his role in a patient's death. Based on testimony at the trial, a jury could find that Eastern had other reasons it did not reveal for terminating Dr. Yedidag–such as discouraging other Eastern physicians from candidly reviewing Eastern's employee physicians in front of competitors.

{63} Unsatisfactory peer reviews can damage an employee-physician's ability to obtain referrals, and therefore harm Eastern's profits. *See* Stein, *supra*, at 1242 (discussing how findings that a physician provided inadequate care can harm that physician's business); Kocker, *supra*, at 1790 (discussing how hospitals rely on their employee-physicians to generate business so that hospitals can recoup the costs of retaining physicians). As a result, the jury could also have reasonably found that Eastern terminated Dr. Yedidag's employment in an attempt to protect its business by trying to suppress potentially candid peer reviews that would reflect poorly on its employee-physicians. *See Terzano*, 549 N.W.2d at 611 (noting that employers have been known to retaliate against employees to protect their financial interests).

{64} This inference becomes stronger when considering that Dr. Yedidag's unprecedented[4] termination "bewildered" peer-reviewers Dr. Peterson and Dr. North. It is possible that the shock value of Dr. Yedidag's termination would discourage other doctors from providing candid peer reviews. *See* Harrington, *supra*, at 332 (noting that employees are less likely to disclose information concerning medical errors because of the threat of employer retaliation). Eastern's termination letter, which Mr. Kueker admitted was less than accurate, effectively precluded Dr. Yedidag

---

[4]Sara Williamson indicated that she knew of no other physician who was terminated for their participation in a peer review process.

42

from obtaining future employment as a surgeon, amplifying the chilling effect of Dr. Yedidag's termination. The jury could have reasonably found that apart from silencing Dr. Yedidag at Eastern's peer reviews, Eastern intentionally undermined Dr. Yedidag's career to reinforce its implied proscription of candid peer reviews. Under these circumstances, a jury could have found that Eastern's termination of Dr. Yedidag's employment was reckless or wanton, *see* UJI 13-1827, and any attempts Eastern made to deliberately undermine peer review candor could constitute intentional acts that deliberately violated ROIA rights and policies. The evidence was sufficient for the jury to find that Eastern wantonly violated ROIA, which is a finding sufficient to justify a punitive damages award.

{65}    With respect to Eastern's arguments that it should not be held liable for punitive damages because whether ROIA created a cause of action is an issue of first impression, this fact does not preclude the finding of a culpable mental state deserving of punitive damages. *See, e.g.*, *Walta*, 2002-NMCA-015, ¶¶ 30, 64 (upholding the imposition of punitive damages although the underlying violation involved an issue of first impression). We also reject Eastern's argument that its consultation with an attorney precludes the imposition of punitive damages. We have explained why a jury could reasonably reject Eastern's contention that it had

43

consulted with an attorney. In addition, a jury could still find from other evidence that Eastern was utterly indifferent to whether it violated ROIA and that it did not properly research the legality of its actions. *See, e.g.*, *Sheetz, Inc. v. Bowles Rice McDavid Graff & Love, PLLC*, 547 S.E.2d 256, 264-66 (W. Va. 2001) (noting that advice of counsel is not necessarily a bar to punitive damages).

{66}    We hold that there was sufficient evidence to submit the issue of punitive damages to the jury. Because Eastern only argued that it lacked a culpable mental state, and not that the damages were excessive as a matter of law, we do not analyze the jury's award for excessiveness. *See Chavez-Rey v. Miller*, 1982-NMCA-187, ¶ 9, 99 N.M. 377, 658 P.2d 452 ("Where a party prays for an award of punitive damages and the evidence is sufficient to permit the issue of punitive damages to be considered by the jury, the amount of such damages is left to the sound discretion of the jury based on the nature of the wrong, the circumstances of each case, and any aggravating or mitigating circumstances as may be shown."). We therefore uphold the award of punitive damages.

**CONCLUSION**

{67}    We affirm the Court of Appeals and hold that Eastern violated the ROIA confidentiality provision by utilizing confidential information concerning Dr.

44

Yedidag's peer review conduct to terminate his employment. Because there was sufficient evidence to establish Eastern's wanton breach of the confidentiality provisions in ROIA, Dr. Yedidag is entitled to both compensatory and punitive damages. We affirm both the district court and the Court of Appeals.

{68}    **IT IS SO ORDERED.**


_____
**EDWARD L. CHÁVEZ, Justice**

**WE CONCUR:**


_____
**BARBARA J. VIGIL, Chief Justice**


_____
**PETRA JIMENEZ MAES, Justice**


_____
**RICHARD C. BOSSON, Justice**


_____
**CHARLES W. DANIELS, Justice**